667 F.2d 1034
 215 U.S.App.D.C. 156, 12 Envtl. L. Rep. 20,105
 KEENE CORPORATION
v.
INSURANCE COMPANY OF NORTH AMERICA, et al. Aetna Casualty
and Surety Company, Appellant.
KEENE CORPORATION, Appellant,
v.
INSURANCE COMPANY OF NORTH AMERICA, et al.
KEENE CORPORATION
v.
INSURANCE COMPANY OF NORTH AMERICA, Liberty Mutual Insurance
Company,Appellant.
KEENE CORPORATION
v.
INSURANCE COMPANY OF NORTH AMERICA, Appellant, Aetna
Casualty and SuretyCompany, et al.
 Nos. 81-1179 to 81-1182.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 16, 1981.
Decided Oct. 1, 1981.
As Amended Dec. 21, 1981.
 
 Gerald V. Weigle, Jr., Cincinnati, Ohio, with whom Frank W. Gaines, Jr., Robert L. Hoegle, Washington, D. C., and Christopher C. Mansfield, Boston, Mass., were on the brief for Liberty Mutual Insurance Company, appellee in Nos. 81-1179, 81-1180 and 81-1182 and cross/appellant in No. 81-1181.
 Robert O. Tyler, Washington, D. C., entered an appearance for Pennsylvania Manufacturers Association Insurance Company, appellee in Nos. 81-1179, 81-1180, 81-1181 and 81-1182.
 Richard A. Epstein, Chicago, Ill., and Leo A. Roth, Jr., Washington, D. C., were on the brief for Federal Insurance Company, et al., Amici Curiae urging reversal in Nos. 81-1179, 81-1180, 81-1181 and 81-1182.
 Thomas M. Susman was on the brief for Walbrook Insurance Company, Ltd., et al., Amici Curiae urging reversal in Nos. 81-1179, 81-1180, 81-1181 and 81-1182.
 David Booth Beers and William R. Galeota, Washington, D. C., were on the brief for Cassiar Resources Limited, Amicus Curiae urging affirmance in part and reversing in part in Nos. 81-1179, 81-1180, 81-1181 and 81-1182.
 Daniel J. Popeo, Paul D. Kamenar and Nicholas E. Calio, Washington, D. C., were on the brief for The Washington Legal Foundation, Amicus Curiae urging remand for full consideration in Nos. 81-1179, 81-1181 and 81-1182.
 Richard H. Gimer, M. Stuart Madden and Donald E. Santarelli, Washington, D. C., were on the brief for Commercial Union Insurance Companies, Amici Curiae urging remand for full consideration in Nos. 81-1179, 81-1180, 81-1181 and 81-1182.
 John Mahoney, Jr., Washington, D. C., for Aetna Casualty and Surety Company, appellant in No. 81-1179 and appellee in Nos. 81-1180, 81-1181 and 81-1182.
 Eugene R. Anderson, New York City, with whom Harold D. Murry, Jr., and Jerold Oshinsky, Washington, D. C., were on the brief for Keene Corporation, appellant in No. 81-1180 and cross/appellee in Nos. 81-1179, 81-1181 and 81-1182.
 Robert N. Sayler, Washington, D. C., with whom Wynne M. Teel, John E. Heintz, Scott D. Gilbert, Washington, D. C., and Frank H. Griffin, III, Philadelphia, Pa., were on the brief for Armstrong World Inc., et al., amici curiae urging reversal in Nos. 81-1179 thru 81-1182.
 John P. Arness, Washington, D. C., with whom David J. Hensler and Elliot M. Mincberg, Washington, D. C., were on the brief for Hartford Accident and Indemnity Company, appellee in Nos. 81-1179 thru 81-1182.
 Michael R. Gallagher, Cleveland, Ohio, with whom Thomas E. Betz, Alan M. Petrov, Cleveland, Ohio, Dennis M. Flannery and John Payton, Washington, D. C., were on the brief for Insurance Company of North America, appellee in Nos. 81-1179, 81-1180 and 81-1182 and cross/appellant in No. 81-1181.
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 78-01011).
 Before BAZELON, Senior Circuit Judge, and WILKEY and WALD, Circuit Judges.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 Opinion filed by Circuit Judge WALD concurring in part.
 BAZELON, Senior Circuit Judge:
 
 
 1
 This case arises out of the growing volume of litigation centering upon manufacturers' liability for disease caused by asbestos products. In this action, Keene Corporation (Keene) seeks a declaratory judgment of the rights and obligations of the parties under the comprehensive general liability policies that the defendants issued to Keene or its predecessors[1] from 1961 to 1980. Specifically, Keene seeks a determination of the extent to which each policy covers its liability for asbestos-related diseases.[2]
 
 
 2
 Between the years 1948 and 1972, Keene manufactured thermal insulation products that contained asbestos. As a result, Keene has been named as a codefendant with several other companies in over 6000 lawsuits alleging injury caused by exposure to Keene's asbestos products. Those cases typically involve insulation installers or their survivors alleging personal injury, or wrongful death, as a result of inhaling asbestos fibers over the course of many years. The plaintiffs in the underlying suits allege that they contracted asbestosis, mesothelioma, and/or lung cancer as a result of such inhalation.[3]
 
 
 3
 From 1961 to the present, Insurance Company of North America (INA), Liberty Mutual Insurance Company (Liberty), Aetna Casualty and Surety Company (Aetna), and Hartford Accident and Indemnity Company (Hartford) issued comprehensive general liability (CGL) insurance policies to Keene. From December 31, 1961 through August 23, 1968, INA insured Keene; from August 23, 1967 through August 23, 1968, Liberty insured Keene;[4] from August 23, 1968 through August 23, 1971, Aetna insured Keene; from August 23, 1971 through October 1, 1974, Hartford insured Keene; and from October 1, 1974 through October 1, 1980, Liberty insured Keene.[5] The policies that these companies issued to Keene were identical in all relevant respects. The coverage language of the policy that Hartford issued to Keene from 1971 to 1974 is typical. It states that
 
 
 4
 (t)he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury ... even if any of the allegations of the suit are groundless, false or fraudulent....
 
 
 5
 E.g., J.A. II at 627. "Bodily injury" is defined as "bodily injury, sickness or disease sustained by any person," id. at 663; and "occurrence" is defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury ... neither expected nor intended from the standpoint of the insured. Id. at 664.[6]
 
 
 6
 Keene tendered the asbestos-related damage cases to its insurance companies for defense and indemnification. Each company, however, either denied all responsibility for the suits or accepted only partial responsibility. Memorandum op. at 2 (J.A. IX at 3532).
 
 
 7
 On June 6, 1978, Keene filed this suit for a declaratory judgment and damages in the United States District Court for the District of Columbia. Keene contended that any stage in the progression of an asbestos-related disease triggers coverage of Keene's entire liability under each of the policies. Aetna, INA, and Liberty argued that coverage is triggered only when bodily injury manifests itself during a policy period. Hartford took an intermediate position, arguing that coverage is triggered by the inhalation of asbestos fibers, but that each company's coverage is determined by the ratio of exposure years during its policy period to the entire period of inhalation.
 
 
 8
 Keene and Hartford filed motions for partial summary judgment based on their respective theories of coverage, and Aetna filed a motion for summary judgment asserting that no case or controversy had been presented. On January 30, 1981, the district court granted Hartford's motion; it granted in part and denied in part Keene's motion; and it denied Aetna's motion. 513 F.Supp. 47. The district court held that indemnification and defense costs should be prorated among the insurance companies according to the relative extent of exposure during their respective policy periods. The district court also held that Keene is liable for a pro-rata share of the costs when exposure occurred during a period in which Keene was uninsured. J.A. IX at 3537-38.
 
 
 9
 Pursuant to 28 U.S.C. § 1292(b) (1976), the district court, sua sponte, certified its order for interlocutory appeal. INA, Liberty, Aetna, and Keene filed Petitions for Leave To Appeal, and on February 20, 1981, this court granted those petitions and ordered that the appeals be consolidated and expedited. We reverse the district court's order and remand the case to trial on the issues of damages and on the issue of the applicability of Liberty's 1967 policy.[7]
 
 I. JUSTICIABILITY
 
 10
 Aetna argues that Keene's declaratory judgment action does not present a case or controversy. Aetna asserts that Keene must raise insurance coverage issues in the context of a particular case in which an insurance company has refused to defend or indemnify Keene. We disagree.
 
 
 11
 The standard for finding a justiciable "case or controversy" in a declaratory judgment action is no less demanding than the standard in any other type of action. Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937). The dispute "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna, supra, 300 U.S. at 241, 57 S.Ct. at 463. This standard was illuminated by Justice Murphy in Maryland Casualty Co. v. Pacific Co., 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), where he stated that "the question (of justiciability) in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. at 273, 61 S.Ct. at 512. See generally Wright & Miller, Federal Practice and Procedure (1973) § 2757.
 
 
 12
 This suit by Keene does not present a hypothetical set of facts. Keene has been, and will continue to be, sued for injuries that result from the use of its asbestos products. For each of these suits-past, present, and future-the rights and obligations of Keene and its insurers must be resolved. There can be no question that the interpretation of the contracts at issue in this case presents a "real and substantial controversy" that can be specifically resolved by a decision in this case.
 
 
 13
 Aetna implies that the rights and obligations created by the insurance policies cannot be determined without consideration of the facts of a particular tort suit. We have before us, however, the terms of the insurance policies and the facts of the particular types of diseases whose coverage is at issue. We are not aware or informed of any facts that would come to light in a particular tort suit that would be relevant to the determination of the policies' applicability to Keene's liability for asbestos-related injury. We hold, therefore, that the case is justiciable.[8]
 
 II. COVERAGE OF THE INSURANCE POLICIES
 
 14
 The language of each policy at issue in this case clearly provides that an "injury," and not the "occurrence" that causes the injury, must fall within a policy period for it to be covered by the policy. Most suits brought under this type of policy involve an injury and an occurrence that transpired simultaneously, or, at least, in close temporal proximity to one another. In cases involving asbestos-related disease, however, inhalation-the "occurrence" that causes the injury-takes place substantially before the manifestation of the ultimate injury-asbestosis, mesothelioma, or lung cancer.[9] Furthermore, although it is not known how little exposure is required to cause disease, inhalation may occur over a long period of time. As a result, inhalation may continue through numerous policy periods, the disease may develop during subsequent policy periods, and manifestation may occur in yet another policy period. For an insured such as Keene, different insurers are likely to be on the risk at different points in the development of each plaintiff's disease. Moreover, part of the development may occur at a time when no insurer was on the risk. Asbestos-related diseases, which are certainly covered by the policies, therefore differ from most injuries and hence present a difficult problem of contractual interpretation.
 
 
 15
 Neither the case law[10] nor the terms of the policies lead us directly to a resolution of the coverage issues raised in this case. Unfortunately, the insurance companies failed to develop policy language that would directly address the full complexity entailed by asbestos-related diseases. We have sought, however, to interpret these contracts in a manner that is equitable and administratively feasible and that is consistent with insurance principles, insurance law, and the terms of the contracts themselves.
 
 
 16
 We conclude that each insurer on the risk between the initial exposure and the manifestation of disease is liable to Keene for indemnification and defense costs. If possible, the factual predicate for the allocation of costs among insurers should be based on the facts of the underlying tort suit. If, however, the tort doctrine governing the underlying suit does not require proof of facts that would form a sufficient basis upon which to allocate insurance liability, then the necessary facts may be determined independently of that suit.[11]
 
 
 17
 In construing the policies' coverage of liability for asbestos-related diseases, our objective must be to give effect to the policies' dominant purpose of indemnity. Couch on Insurance 2d, §§ 15:22, 15:41 (2d ed. Anderson 1959); 4 Williston on Contracts, § 900 (3d ed. Jaeger 1959). An insurance contract represents an exchange of an uncertain loss for a certain loss. In a comprehensive general liability insurance policy, the uncertain loss is the possibility of incurring legal liability, and the certain loss is the premium payment. By issuing the policy, the insurer agrees to assume the risk of the insured's liability in exchange for a fixed sum of money. At the heart of the transaction is the insured's purchase of certainty-a valuable commodity. See S. Huebner, K. Black, Jr., R. Cline, Property and Liability Insurance (2d ed. 1976) 5-7. This view of the insurance policies provides the starting point for analysis.
 
 
 18
 The next question must be "certainty with respect to what contingencies?" For an insured is only entitled to indemnity for losses that are covered by its policy. We are aided in our analysis of these policies' coverage by the well-accepted rule that ambiguity in an insurance contract must be construed in favor of the insured. See, e.g., Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mut. Ins. Co., 385 Pa. 394, 123 A.2d 413 (1956); Couch on Insurance 2d, § 15:14 (2d ed. Anderson 1959); Williston on Contracts, § 621 (3d ed. Jaeger 1959). We believe, however, that although particular terms of the policies are ambiguous as applied to asbestos-related diseases, the principles embodied in the insurance policies provide a sufficient basis upon which to decide this case. In discerning those principles, our guide is-as it must be-the reasonable expectations of Keene when it purchased the policies. See, e.g., Steven v. Fidelity & Cas. Co., 58 Cal.2d 862, 869-70, 377 P.2d 284, 288-89, 27 Cal.Rptr. 172, 176-77 (1962); Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305, 208 A.2d 638, 644 (1965); Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 388 A.2d 1346 (1978); Couch on Insurance 2d, § 15:16 (2d ed. Anderson 1959).[12]
 
 
 19
 The analysis of the insurers' duty to indemnify Keene is divided into three logical steps: first, the trigger of coverage under the policies; second, the extent of coverage once a policy is triggered; and third, the allocation of liability among insurers if more than one policy is triggered. That analysis is followed by an examination of the insurers' duty to defend Keene and a discussion of the procedural mechanisms by which asbestos-injury suits can be adjudicated.
 
 A. Trigger of Coverage
 
 20
 The first step in the analysis of this problem is to determine what events, from the point of exposure to the point of manifestation, trigger coverage under these policies. In the language of the policies, the question is when did "injury" occur? Both Keene and Hartford advance slightly different versions of the "exposure theory" of coverage. Keene argues that successive coverage is triggered by both exposure to asbestos dust ("inhalation exposure")[13] and the subsequent development of disease ("exposure in residence").[14] Keene bases its argument on medical evidence that the body incurs microscopic injury as asbestos fibers become lodged in the lungs and as the surrounding tissue reacts to the fibers thereafter. Hartford also argues that successive coverage is triggered by continued exposure. Its argument is similarly based on the medical evidence of discrete tissue damage as each asbestos fiber reaches the lungs. For no apparent reason, however, Hartford asserts that the continued progression of disease following exposure does not trigger additional coverage.[15] Basing its decision on Insurance Co. of N. America v. Forty-Eight Insulations, 633 F.2d 1212 (6th Cir. 1980), aff'd on rehearing, 657 F.2d 814 (6 Cir. 1981), the district court adopted Hartford's version of the exposure theory.[16]
 
 
 21
 INA, Liberty, and Aetna advance the "manifestation" theory of coverage. They argue that coverage is triggered only by the manifestation of either asbestosis, mesothelioma or lung cancer. They assert that their interpretation of the contracts is supported by the ordinary meaning of the terms "bodily injury, sickness or disease." They claim that "bodily injury" does not occur until cellular damage advances to the point of becoming a recognizable disease. INA and Liberty rely on cases in other areas of the law-workmen's compensation, health insurance coverage, and statutes of limitation-that support their interpretation of the term "injury." E.g., Travelers Insurance Co. v. Cardillo, 225 F.2d 137 (2d Cir.), cert. denied, 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955) (workmen's compensation), cited in Liberty's brief at 42-44 and INA's brief at 28; Reiser v. Metropolitan Life Insurance Co., 262 App.Div. 171, 28 N.Y.S.2d 283 (1941) aff'd, 289 N.Y. 561, 43 N.E.2d 534 (1942) (health insurance), cited in Liberty's brief at 45 and INA's brief at 26; Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (statute of limitations), cited in INA's brief at 27.
 
 
 22
 The policy language does not direct us unambiguously to either the "exposure" or "manifestation" interpretation. In the context of asbestos-related disease, the terms "bodily injury," "sickness" and "disease," standing alone, simply lack the precision necessary to identify a point in the development of a disease at which coverage is triggered. The fact that a doctor would characterize cellular damage as a discrete injury does not necessarily imply that the damage is an "injury" for the purpose of construing the policies. At the same time, the fact that an ordinary person would characterize a fully developed disease as an "injury" does not necessarily imply that the manifestation of the disease is the point of "injury" for purposes of construing the policies. In interpreting a contract, a term's ordinary definition should be given weight, but the definition is only useful when viewed in the context of the contract as a whole.
 
 
 23
 Moreover, the legal definition of "injury" in other contexts informs the term's definition in this case only if the term operates in a functionally similar manner in the other contexts. In the areas of workmen's compensation, health insurance, and statutes of limitations, the concept of "injury" performs a function that is different from its function in the context of comprehensive general liability policies.[17] Therefore, the term's definition in those contexts is only minimally relevant to the question at hand. Instead, the purpose of the insurance policies must inform our construction of the term "injury".
 
 
 24
 If exposure to asbestos were deemed to constitute a discrete injury and thereby trigger coverage, as Hartford and Keene suggest, the subsequent development of a disease would be characterized best as a consequence of the injury. Future stages of development would not constitute new injuries[18] and therefore would not trigger additional coverage.[19] Under that interpretation, a manufacturer who bought a comprehensive general liability policy would not bear the risk of liability for diseases that occurred due to exposure during a covered period. It would, however, bear the risk of liability for diseases that manifest themselves during the covered period, but that occur because of exposure at a time when the manufacturer held no insurance. As a result, the manufacturer's purchase of insurance would not constitute a purchase of certainty with respect to liability for asbestos-related diseases. The insured would remain uncertain as to future liability for injuries whose development began prior to the purchase of insurance. There is no indication that such a de facto exclusion of coverage from the policies was in the contemplation of any party to the contracts in this case. At the least, such an exclusion is inconsistent with Keene's reasonable expectations when it purchased the policies. The policies state that the insured is covered for "injury" during the policy period. In purchasing such coverage, Keene could have reasonably expected that it was covered for all future liability, except liability for injuries of which Keene could have been aware prior to its purchase of insurance. A latent injury, unknown and unknowable to Keene at the time it purchased insurance, must, at least, be covered by an insurer on the risk at the time it manifests itself. Any other result would violate very reasonable expectations of Keene. Therefore we hold that manifestation of disease is one trigger of coverage under the policies.[20]
 
 
 25
 In American Motorists Ins. Co. v. Squibb, 95 Misc.2d 222, 406 N.Y.S.2d 658 (1978), the court faced an issue similar to the one in this case, under an insurance policy that was similar in all relevant respects to the policies we have before us. That case involved a drug manufacturer's liability for cancer that was caused by the ingestion of DES by the victims' mothers during pregnancy many years earlier. Squibb argued that the insurance company on the risk at the time of the disease's manifestation was obligated to pay the damages. The insurance company responded by arguing that the injury occurred when the victims' mothers ingested the drug and not when the disease manifested itself. The court held that "bodily injury" occurred when the cancer manifested itself. The court stated that "the policy language does not limit coverage to incidents of exposure during the policy period, but rather to conditions which result in bodily injury during the policy period." Id. 406 N.Y.S.2d at 659. That court did not have to determine the liability of an insurer that was on the risk prior to the diseases' manifestation.
 
 
 26
 Thus, if the purpose of the policies is not to be undercut, the manifestation of disease must constitute an "injury". Any characterization of exposure as a discrete injury, therefore, must be rejected. This is the same result that courts have reached in determining when an injury or disease begins for purposes of health and accident insurance policies. In those cases, courts have held that a manifestation rule is necessary to protect the reasonable expectations of the insured. E.g., Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914 (1930); Cohen v. North American Life & Casualty Co., 150 Minn. 507, 185 N.W. 939 (1921). In health and accident insurance policies, as in liability insurance policies, the purpose of the contracts would be defeated if the insured had to bear the risk of disease that is latent at the time a policy is purchased. See Comment, Liability Insurance for Insidious Disease: Who Picks Up the Tab? 48 Fordham L.Rev. 657, 671 (1980) (this rule is necessary to provide security policyholder seeks).
 
 
 27
 None of this implies, however, that insurance policies may not also be triggered prior to manifestation. In fact, we conclude that coverage is also triggered by both inhalation exposure and exposure in residence.
 
 
 28
 To demonstrate why the policies require that both exposure and manifestation trigger coverage, we begin by positing a rule in which manifestation is the sole trigger of coverage. If that interpretation were adopted, as INA, Liberty, and Aetna propose, Keene would not be covered for diseases manifesting themselves after 1976.[21] By that time, it was widely known that prolonged inhalation of asbestos has a high probability of causing disease.[22] From about then on, insurance companies ceased issuing policies that adequately cover asbestos-related disease. Yet we can still expect thousands of cases of those diseases to manifest themselves throughout the rest of the century. If we were to hold that only the manifestation of disease can trigger coverage, the insurance companies would have to bear only a fraction of Keene's total liability for asbestos-related diseases.
 
 
 29
 The possibility of that result would undermine the function of the insurance policies. When Keene purchased the policies, it could have reasonably expected that it was free of the risk of becoming liable for injuries of which it could not have been aware prior to its purchase of insurance.[23] There is no doubt that these losses would be covered if the diseases at issue developed spontaneously upon inhalation. Inhalation of asbestos is an "occurrence" that causes injury for which Keene may be held liable. The possibility that the insurers may not be liable arises solely because there is a period of time between the point at which the injurious process began and the point at which injury manifests itself. In this case, during that interim period, the existence of latent injury among people who had worked with asbestos became predictable with a substantial degree of certainty. The injury and attendant liability became predictable precisely because it was discovered that past occurrences were likely to have set in motion injurious processes for which Keene could be held liable. To accept the argument that only manifestation triggers coverage-and allow insurers to terminate coverage prior to the manifestation of many cases of disease-would deprive Keene of the protection it purchased when it entered into the insurance contracts. We, therefore, reject the manifestation theory as presented by INA, Aetna, and Liberty,[24] because it does not allow exposure, as well as manifestation to trigger insurance coverage.
 
 
 30
 Thus, in order for Keene's rights under the policies to be secure, both inhalation exposure and exposure in residence must also trigger coverage. Regardless of whether exposure to asbestos causes an immediate and discrete injury, the fact that it is part of an injurious process is enough for it to constitute "injury" under the policies.
 
 
 31
 This conclusion is consistent with the law involving insurance coverage of losses that begin during a period of coverage but continue to develop after a policy's expiration. For example, Snapp v. State Farm Fire & Cas. Co., 206 Cal.App.2d 827, 24 Cal.Rptr. 44 (1962) involved a fire insurance policy that included coverage of most types of physical damage to property. The policy was issued on the plaintiff's house, which had been damaged due to movement of the land under the house. While the land was still unstable, the policy expired, and the insurer sought to limit its liability to the amount of damage that had occurred prior to the policy's termination date. The court held that the insurer's liability was not so limited, and that it had to indemnify the policyholder for all damage caused until the land movement ceased. The court stated that "(t)o permit the insurer to terminate its liability while the fortuitous peril which materialized during the term of the policy was still active would not be in accord either with applicable precedents or with the common understanding of the nature and purpose of insurance." See also Harman v. American Cas. Co., 155 F.Supp. 612 (S.D.Cal.1957) (insurer cannot terminate property loss or fire protection while land remains unstable).
 
 
 32
 These cases illustrate the principle that when it becomes known that an occurrence has set in motion a process that has a significant probability of resulting in a covered loss, the insurer on the risk at that time is liable for the full loss. It does not matter whether the insurer learns of a progressing loss through direct observation, as in Snapp, or through statistical inference, as in asbestos-injury cases. It is the use of that knowledge to shift a covered risk back to the insured that is not permitted.[25]
 
 
 33
 In sum, the allocation of rights and obligations established by the insurance policies, would be undermined if either the exposure to asbestos or the manifestation of asbestos-related disease were the sole trigger of coverage. We conclude, therefore, that inhalation exposure, exposure in residence, and manifestation all trigger coverage under the policies. We interpret "bodily injury" to mean any part of the single injurious process that asbestos-related diseases entail. We now proceed to consider the extent to which an insurer is liable to its policyholder once coverage under its policy is triggered.
 
 B. The Extent of Coverage
 
 34
 The policies at issue in this case provide that the insurance company will pay on behalf of Keene "all sums" that Keene becomes legally obligated to pay as damages because of bodily injury during the policy period. We have defined "bodily injury" to mean any part of the injurious process that begins with an initial exposure and ends with manifestation of disease. As a result, when Keene is held liable for an asbestos-related disease, only part of the disease will have developed during any single policy period. The rest of the development may have occurred during another policy period or during a period in which Keene had no insurance. The issue that arises is whether an insurer is liable in full, or in part, for Keene's liability once coverage is triggered. We conclude that the insurer is liable in full, subject to the "other insurance" provisions discussed in section C below.
 
 
 35
 Hartford argues that each insurer is required to pay only a pro-rata share of Keene's liability. Once an insurer's coverage is triggered, its share would be determined by the duration of a plaintiff's exposure to Keene's products during its policy periods in relation to the entire duration of the plaintiff's exposure to Keene's products. Under Hartford's scheme, if there is a period of exposure during which Keene is uninsured, then Keene would bear a pro-rata share of the liability.[26]
 
 
 36
 Hartford's argument is based on its characterization of asbestos-related diseases as consisting of a multitude of discrete injuries to the lung tissue. We have declined, however, to rely on that factual characterization in determining the trigger of insurance coverage,[27] and we decline to rely on it in determining the extent of coverage. Instead, we continue to rely on the terms of the contracts and the principles they embody.
 
 
 37
 Our starting point is the interpretation of the policies as the insurers' promises of certainty to Keene. The policies that were issued to Keene relieved Keene of the risk of liability for latent injury of which Keene could not be aware when it purchased insurance. Keene did not expect, nor should it have expected, that its security was undermined by the existence of prior periods in which it was uninsured, and in which no known or knowable injury occurred.[28] If, however, an insurer were obligated to pay only a pro-rata share of Keene's liability, as the district court held, those reasonable expectations would be violated. Keene's security would be contingent on the existence and validity of all the other applicable policies. Each policy, therefore, would fail to serve its function of relieving Keene of all risk of liability. The logical consequence of this is that the policies must require that once an insurer's coverage is triggered, the insurer is liable to Keene to the full extent of Keene's liability up to its policy's limits, but subject to "other insurance" clauses, discussed in section C, below.
 
 
 38
 Judge Wald suggests that the rationale of our decision is consistent with prorating insurance obligations to Keene for the years in which it was not insured. Judge Wald believes such a pro-rata allocation is fair, and we do not think her view is unreasonable. As we have just shown, however, such an allocation is inconsistent with the terms and underlying principles of the insurance policies at issue in this case.
 
 
 39
 We read Judge Wald's reasoning as follows: 1) As the court interprets the term, an asbestos-related "injury" occurs over a long period of time; 2) if Keene was uninsured during part of that time, then Keene is not covered for the full injury; 3) therefore, Keene should pay a pro-rata share of its own liability.
 
 
 40
 If we read Judge Wald correctly, her position is problematic. Although we have defined the term "injury," we have done so only as an incidental aspect of a logically prior determination of Keene's rights under the policies viewed in their entirety. The insurance policies provide Keene with the right to be free of all liability for asbestos-related disease, unless such a disease was known or knowable by Keene at the time it purchased an insurance policy.[29] For that right to be preserved, each policy that Keene purchased between an initial exposure and the ultimate manifestation of a disease must be triggered. In a sense, that means that "injury" occurred during each of the policy periods. It does not mean, however, that there was some "injury" that did not occur during a policy period. That conclusion and the implication that the insurers are not obligated to indemnify Keene in full contradicts the first and foremost aspect of our decision-our holding that each policy provides Keene with the right to be free of liability for asbestos-related disease.
 
 
 41
 As stated above, each policy has a built-in trigger of coverage. Once triggered, each policy covers Keene's liability. There is nothing in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period. As we interpret the policies, they cover Keene's entire liability once they are triggered. That interpretation is based on the terms of the policies themselves. We have no authority upon which to pretend that Keene also has a "self-insurance" policy that is triggered for periods in which no other policy was purchased. Even if we had the authority, what would we pretend that the policy provides? What would its limits be? There are no self-insurance policies, and we respectfully submit that the contracts before us do not support judicial creation of such additional insurance policies.
 
 
 42
 Hartford argues that this allocation of liability allows Keene to "enjoy the benefits of insurance coverage which it has never paid for." Hartford's brief at 31.[30] The contrary point, however, is more accurate: For an insurer to be only partially liable for an injury that occurred, in part, during its policy period would deprive Keene of insurance coverage for which it paid. With each policy, Keene paid for insurance against all liability for bodily injury. The policies do not distinguish between injury that is caused by occurrences that continue to transpire over a long period of time and more common types of injury.[31] Nor do the policies provide that "injury" must occur entirely during the policy period for full indemnity to be provided.
 
 
 43
 In support of its argument for pro-rata apportionment of liability, Hartford asserts that the liability scheme we now adopt would leave an insured equally off with one year of insurance coverage as it would be with several years of coverage. Id. That assertion is inapposite for two reasons. First, as a matter of probability, the more years of coverage that an insured has purchased, the smaller will be the number of injuries for which it will be liable. An insured will not be covered for an injury if it has insurance neither when a plaintiff's disease was developing nor when the disease manifested itself.[32] Second, and perhaps more important, because we hold below that only one policy's limits of liability may apply to one injury,[33] an insured who has purchased several policies that cover an injury will only be able to collect under one of those policies, even though he paid for several. Therefore, it is the insurer-not the insured-who reaps the most benefit from the similarity of treatment between an insured with one year of coverage and an insured with several years of coverage.[34]
 
 
 44
 Not surprisingly, the policies do not explicitly provide a means of applying the limits of liability to injuries that are covered by multiple policies. Keene claims that it is entitled to full indemnity for each injury up to the sum of the limits provided by the applicable policies. We do not agree. The principle of indemnity implicit in the policies requires that successive policies cover single asbestos-related injuries. That principle, however, does not require that Keene be entitled to "stack" applicable policies' limits of liability. To the extent possible, we have tried to construe the policies in such a way that the insurers' contractual obligations for asbestos-related diseases are the same as their obligations for other injuries. Keene is entitled to nothing more. Therefore, we hold that only one policy's limits can apply to each injury. Keene may select the policy under which it is to be indemnified. Cf. Forty-Eight, supra, 633 F.2d at 1226 n.28.
 
 C. Allocation of Liability
 
 45
 In any suit against Keene for an asbestos-related disease, it is likely that the coverage of more than one insurer will be triggered. Because each insurer is fully liable, and because Keene cannot collect more than it owes in damages, the issue of dividing insurance obligations arises. The only logical resolution of this issue is for Keene to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury. That is the only way that Keene can be assured the security that it purchased with each policy. Our holding each insurer fully liable to Keene is also consistent with other courts' allocation of liability when more than one insurer covers an indivisible loss. E.g., Gruol Construction Co. v. Insurance Company of North America, 11 Wash.App. 632, 524 P.2d 427 (1974) (continuous damage to property insurance policy).
 
 
 46
 This does not mean that a single insurer will be saddled with full liability for any injury. When more than one policy applies to a loss, the "other insurance" provisions of each policy provide a scheme by which the insurers' liability is to be apportioned. For instance, INA's policy states:
 
 
 47
 When both this insurance and other insurance apply to the loss on the same basis, whether primary, excessive or contingent, INA shall not be liable under this policy for a greater proportion of the loss than stated in the applicable contribution provision below.
 
 
 48
 J.A. II at 551. The contribution provision referred to contains formulae for "contribution by equal shares" and for "contribution by limits," depending upon the provisions of other applicable policies.[35] These provisions of the policies must govern the allocation of liability among the insurers in any particular case of asbestos-related disease. However, the primary duty of the insurers whose coverage is triggered by exposure or manifestation is to ensure that Keene is indemnified in full.[36]
 
 D. Costs of Defending Suits Against Keene
 
 49
 The policies provide that the insurer shall defend any suit against Keene for damages due to bodily injury, even if the suit is groundless, false or fraudulent. The insurers' duty to defend Keene and to pay Keene for its defense costs are more broad than their duty to indemnify Keene. As long as a complaint indicates that Keene may be liable for an injury, an insurer must defend Keene if the facts alleged in the complaint indicate that its policy covers the alleged injury. Because we hold that each insurer is fully liable to Keene for indemnification, it follows that each is fully liable for defense costs.[37]
 
 
 50
 Of course, only the insurer that Keene selects will defend Keene. The duty of that insurer is simply to defend Keene, not to minimize its own liability. As we state below, the factual basis of the insurers' contract obligations may be developed independently of the factual basis of the tort suit. If it is possible to resolve both the tort dispute and the insurance contract dispute together, without disrupting the tort victim's suit and without imposing undue inconvenience on the victim, a trial court may do so. Otherwise the two disputes should be resolved separately. This should eliminate the possibility that the insurer that represents Keene at trial will attempt to skew the factual record to the disadvantages of other insurers.[38]
 
 E. Resolution of Factual Issues
 
 51
 In a typical suit for products liability, the same set of facts would prove both the manufacturer's tort liability and the insurer's contractual liability. That is not true of suits that arise out of an asbestos-related disease. The leading case concerning manufacturers' liability for asbestos damage claims is Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir. 1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). The court in Borel held that each manufacturer who contributed in any way, and at any time, to a claimant's bodily injury is fully liable for all of the resulting damages. If a victim was exposed to the products of more than one manufacturer, each manufacturer is jointly and severally liable to the victim. See also Karjala v. Johns Manville Products Corp., 523 F.2d 155 (8th Cir. 1975). As a result, a plaintiff in a suit against Keene need not prove the full extent of his or her exposure to asbestos. Yet that set of facts is essential to determining which policies cover Keene's liability.
 
 
 52
 The doctrine of joint and several tort liability in this context is an accepted means of vindicating the rights of the tort victims. Nothing that we decide concerning the contractual liability of the insurers to Keene should impair the tort plaintiff's prosecution of his or her suit.[39]
 
 
 53
 Thus initially, the full insurance obligation to Keene must be divided among the insurers whose policies are triggered based on the facts brought out in the tort suit against Keene. The possibility of additional coverage can be determined consensually among insurers, or it can be adjudicated among insurers in a subsequent lawsuit. At that point the insurance obligations can be reallocated among all the insurers whose policies are found to cover a particular injury.[40] Any facts concerning the period of exposure or the point of manifestation that are proved in an underlying tort suit need not be legally dispositive of a dispute among insurers concerning allocation of their liability. Perhaps if the underlying tort suit would not be disputed and the plaintiff would not be put to undue inconvenience, the factual record needed to allocate insurance responsibility may be developed during the course of the underlying tort suit.[41]
 
 
 54
 If a victim sues more than one asbestos-product manufacturer, it may be impossible to prove which company's products were used at which time. If so, it will be impossible to prove that exposure to Keene's products-as opposed to those of another manufacturer-occurred during a particular time period. In such a case, there should be a presumption that throughout the victim's period of exposure to asbestos he or she was exposed to Keene's and the other manufacturers' products. The insurer defending Keene in the underlying tort suits may then try to show that Keene's products could not have been involved for certain years.[42] Similarly, if a suit arises to resolve the allocation of insurance liability, any insurance company can try to prove that there was no inhalation of Keene's asbestos during or before its policy period. If an insurance company does so, then that company will be free of liability.
 
 III. LIBERTY'S 1967-68 POLICY
 
 55
 The district court included Liberty's 1967-68 policy among the policies that potentially cover Keene's liability for asbestos-related injury.[43] Liberty argues that the policy does not cover Keene's liability for injuries caused by the products of its former subsidiary Baldwin-Ehret-Hill. In opposition to Keene's motion for summary judgment, Liberty submitted affidavits to support its position. Liberty also argues that if the policies did cover Baldwin-Ehret-Hill, that facet of their coverage was conveyed to Gale Corporation when Keene sold Baldwin-Ehret-Hill to Gale.[44] Keene responds by arguing that Endorsement No. 1 of the policy provides for coverage of any subsidiary in which Keene owned more than a fifty-percent interest.[45] In February 1968, Keene acquired more than fifty percent of Baldwin-Ehret-Hill's stock. Therefore, Keene argues, Baldwin-Ehret-Hill was covered by Liberty's policy.
 
 
 56
 We hold that there was before the district court a genuine issue of material fact on this point. Therefore, the district court erred in including the issue in its summary judgment order.
 
 CONCLUSION
 
 57
 In view of the above, we reverse the district court's order of summary judgment. The district court should enter a judgment and institute further proceedings consistent with this opinion.
 
 
 58
 So ordered.
 
 
 59
 Appendix A: Variations in Policy Language *
 
 
 60
 Indemnification Defense
Insurer Policy Period Provision Provision
-----------------------------------------------------------------------------
INA 12/31/61- To pay on behalf of (T)he company shall...
 12/31/64 ** the insured...damages defend any suit against
 because of bodily the insured alleging such
 injury...arising injury...even if such
 out of...all... suit is groundless,
 operations (other false or fraudulent
 than automobile) of
 the insured
 1/1/65-1/1/68 Same Same
 1/1/68-8/23/68 INA will pay on INA shall have the right
 behalf of the and duty to defend any
 Insured...damages suit against the Insured
 because of personal seeking damages on account
 injury...to of such personal injury...
 which this even if any of the
 insurance applies, allegations of the suit
 caused by an are groundless, false or
 occurrence fraudulent
Hartford 8/23/71-8/23/72 The company will pay (T)he company shall
 on behalf of the have the right and
 insured...damages duty to defend any
 because of...bodily suit against the
 injury...to which insured seeking
 this insurance damages on account
 applies, caused by of such bodily
 an occurrence injury...even if any
 of the allegations
 of the suit are
 groundless, false
 or fraudulent
 8/23/72-8/23/73 Same Same
 8/23/73-10/1/74 Same Same
Liberty 8/23/67-8/23/68* The company will pay (T)he company shall
 Mutual on behalf of the have the right and
 insured...damages duty to defend any
 because of...bodily suit against the
 injury...to which insured seeking
 this policy applies, damages on account
 caused by an of such bodily
 occurrence injury...even if
 any of the
 allegations of the
 suit are groundless,
 false or fraudulent
 Aetna 8/23/68-8/23/71 The company will (T)he company shall
 pay on behalf of have the right and
 the insured... duty to defend any
 damages because suit against the
 of bodily injury... insured seeking
 to which damages on account
 this insurance of such bodily
 applies, caused injury...even if
 by an occurrence any of the allegations
 of the suit are
 groundless, false
 or fraudulent
Liberty 10/1/74-10/1/75 The company will pay (T)he company shall
 Mutual on behalf of the have the right and
 insured...damages duty to defend any
 because of...bodily suit against the
 injury...to which insured seeking
 this policy applies, damages on account
 caused by an of such bodily
 occurrence injury...even if
 any of the
 allegations of the
 suit are groundless,
 false or
 fraudulent
 10/1/75-10/1/76 Same Same
 10/1/76-10/1/77 The company will pay (T)he company shall
 on behalf of the have the right and
 insured...damages duty to defend any
 because of...personal suit against the
 injury*... to which insured seeking
 this policy applies, damages on account
 caused by an of such personal
 occurrence injury...even if
 any of the
 allegations of the
 suit are groundless,
 false or fraudulent
Liberty 10/1/77-10/1/78 Same Same
 Mutual
 10/1/78-10/1/79 Same Same
 10/1/79-10/1/80 Same Same
 
 
 61
 Policy Period/
 Definitions Territory
-------------------------------------------------------------------------------
The words "bodily This policy applies
injury"... only to occurences
bodily injury, or accidents which
sickness, disease take place during
 the policy period
Same Same
(P)ersonal injury This insurance
means...bodily applies only to
injury, disability personal injury...
 which occurs
"(B)odily injury" during the policy
means bodily period
injury, sickness
or disease
sustained by
any person
(Definition of
"occurrence"
applies only to
property damage)
"(B)odily injury" This insurance
means bodily applies only to
injury, sickness bodily injury...
or disease which occurs
 during the
"(O)ccurrence" policy period
means an event
including
injurious exposure
to conditions
which
result, during
the policy
period in
bodily injury
Same Same
"(B)odily Same
injury" means
bodily injury,
sickness or
disease...
which occurs
during the
policy period
"(O)ccurrence"
means an event
including
injurious
exposure to
conditions which
result, during
the policy
period in
bodily injury
"(B)odily injury" Not relevant
means bodily
injury, sickness
or disease...which
occurs during the
policy period
"(O)ccurrence"
means an accident
including
continuous or
repeated exposure
to conditions
which results in
bodily injury
"(B)odily injury" This insurance
means bodily injury, applies only to
sickness or disease bodily injury
 ...which occurs
"(O)ccurrence" means during the policy
an accident, including period
injurious exposure
to conditions,
which results,
during the
policy period, in
bodily injury
"(B)odily injury" Not relevant
means bodily
injury, sickness,
or disease...
which occurs
during the policy
period
"(O)ccurrence"
means an accident,
including continuous
or repeated
exposure to conditions
which results in
bodily injury
Same Same
"Personal injury" Not relevant
means...bodily
injury
"(B)odily injury"
means bodily
injury, sickness or
disease...which
occurs during
the policy period
"(O)ccurrence"
(as amended)
means...exposure
to conditions
which results in
"bodily injury"...
neither expected
nor intended from
standpoint of the
"insured"
Same Same
Same Same
Same Same
 
 
 62
 * Source: J.A. III at 1031-35.
 
 
 63
 ** All policy provisions are taken from the 1/1/65-1/1/68 policy.
 
 
 64
 * All policy provisions are taken from the 10/1/74-10/1/75 policy.
 
 
 65
 * The term "personal injury" was substituted, by endorsement, for bodily injury
 
 WALD, Circuit Judge, concurring in part:
 
 66
 This is a case of first impression and, irrespective of how it is resolved, requires a "leap of logic," maj. op. n. 34, from existing precedent, for it concerns diseases about which there is no medical certainty as to precisely how or when they "occur." We do know the prerequisite-exposure to asbestos fibers-and the symptoms that manifest themselves, generally too late for effective treatment. What happens in between is still something of a mystery; why does one exposed person fall victim to the diseases while another does not? This suit is one of several filed in different courts to ascertain the liability of insurers of manufacturing companies when those companies are sued by asbestosis, mesothelioma and lung cancer victims who have been exposed to the companies' products. Two circuits, the Fifth[1] and Sixth,[2] have determined that exposure alone should trigger the insurer's liability.[3] The Sixth Circuit has also determined that the judgment awarded to the victim should be allocated among insurance companies pro rata according to their share of the total risk period during which the manufacturer was insured. If the risk period includes years when the manufacturer was uninsured (or self-insured), the manufacturer must bear a proportional share of the judgment.[4]
 
 
 67
 The approach taken in the panel opinion here is different from the approaches of other courts in two significant respects. First, it defines the "injury" that triggers insurance coverage not merely as exposure to asbestos fibers or manifestation of the symptoms of asbestosis, mesothelioma or lung cancer, but also-at least in the case of asbestosis-as the process by which the victim's body resists, adapts, and tries to accommodate itself to a foreign matter-a process, which we understand from the medical testimony elicited at trial, is a major, if not primary, factor in the development of asbestosis. In short, the "injury" is taking place every year that the asbestos fiber remains in situs until tissue damage in the lungs is significant enough to be detected by X-rays or to produce symptomatic effects of asbestosis, mesothelioma or lung cancer. See maj. op. at n.3. I agree with this more comprehensive definition of "injury," encompassing the period from initial exposure to manifestation, because it comports with what we know and do not know about the etiology and progress of the diseases. This process-oriented definition not only provides a flexible formula for adjudicating the legal issues associated with asbestos-related diseases, but also sets a useful precedent for other product-exposure injuries, as of yet unknown in origin. Further, the more comprehensive definition will give much needed certainty to the insurance industry, currently rent asunder by advocates of exposure and manifestation, whose fluctuating positions often depend upon their economic interests in a particular case, and by differing judicial rulings which seem to depend at least partially upon the equities of each case.
 
 
 68
 Second, the majority opinion exempts asbestos manufacturers from all financial responsibility arising from a suit if the manufacturer had purchased insurance which covered any part of the injury period.[5] I am not able to agree with this aspect of the majority opinion, as it applies to the period prior to the time when such coverage could no longer be obtained.[6] I just do not understand why an asbestos manufacturer, which has consciously decided not to insure itself during particular years of the exposure-manifestation period, should have a reasonable expectation that it would be exempt from any liability for injuries that were occurring during the uninsured period. It seems to me logical and fair[7]-as it seemed to the Sixth Circuit and to the trial court here-to distribute the ultimate financial responsibility on a pro rata basis among the various insurance companies on line during the risk period, and to include Keene as a self-insurer for the years when it failed to take out any insurance. This position, advocated by the Hartford Accident and Indemnity Company, is not, as the panel opinion says, maj. op. at 1047, based upon a conceptualization of asbestos-related diseases as a multitude of discreet injuries to the victim. Rather, it is based upon the very notion of "injury" adopted by the panel. If asbestos-related diseases are understood as progressive or cumulative, then all those who voluntarily assumed risk during the period when the diseases progressed must share the responsibility for the judgment and this includes self-insurers. If the risk is to be shared only by the insurance companies, a manufacturing company that purchased insurance intermittently during the risk period would be as secure as those prudent companies that continually purchased insurance.
 
 
 69
 Subject to this concern, I concur with the majority opinion.
 
 
 
 [1]
 Keene Corporation was formed in 1967 and subsequently purchased most of the stock of Baldwin-Ehret-Hill, Inc. In 1968, Baldwin-Ehret-Hill became a subsidiary of Keene, and in 1970 it was merged into Keene Building Products Corporation, another Keene subsidiary. All corporations sold thermal insulation products that contained asbestos. Keene's brief at 5-6. All corporations will be referred to as "Keene" for simplicity
 
 
 [2]
 Under Borel v. Fibreboard Paper Prods., 493 F.2d 1076 (5th Cir. 1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), an asbestos manufacturer such as Keene can be held jointly and severally liable for asbestos-related diseases that were caused, in part, by its products
 
 
 [3]
 Asbestosis is a fibrous condition of the lungs, which is caused by asbestos fibers reaching the alveoli. Once begun, the condition progresses without additional inhalation of asbestos, but it becomes even more serious if inhalation continues. The seriousness of the disease in individual cases depends on the duration and intensity of inhalation and on individual idiosyncrosy. See Selikoff, Bader, Bader, Churg, and Hammond, Asbestosis and Neoplasia, 42 Am.J.Med. 487 (1967); Selikoff, Churg, and Hammond, The Occurrence of Asbestosis Among Insulation Workers, 132 Ann.New York Acad.Sci. 139 (1965). For a brief discussion of asbestosis, see Borel v. Fibreboard Paper Products Corp., supra note 2
 Mesothelioma is a malignant tumor of the lining of the lungs or the lining of the peritoneum, which surrounds the organs of the gastrointestinal tract. It is well-established that prolonged inhalation of asbestos fibers causes mesothelioma. The disease can develop many years after inhalation ceases, and can manifest itself several months after it begins to develop.
 Lung cancer, or bronchogenic carcinoma, is also generally thought to be caused by prolonged inhalation of asbestos. It too can develop and manifest itself long after inhalation ceases.
 The details of the development of these diseases are not relevant to the issues decided below. The only relevant facts are that the diseases develop long after exposure to Keene's products, and that Keene can be held liable for their occurrence.
 
 
 [4]
 From August 8, 1967 through August 23, 1968, both INA and Liberty insured Keene. Liberty argues that its 1967-68 policy does not cover Keene's liability for asbestos-related disease. That issue, which the district court decided against Liberty, is addressed in Part III below
 
 
 [5]
 J.A. at 1028-29. From November 1, 1948 through November 1, 1959, Pennsylvania Manufacturers' Association Insurance Co. insured Keene. Whether its policies covered products liability is in dispute in another case. See Keene Corp. v. Pennsylvania Manufacturers' Association Insurance Co., 513 F.Supp. 47 (D.D.C.1981), remanded, No. 81-1248 (D.C.Cir. Oct. 1, 1981)
 
 
 [6]
 For a summary of the differences in coverage language amount of the policies, see Appendix A (reproduced from J.A. III at 1031-35). All of the policies are reproduced at J.A. I at 17-245, J.A. II at 537-832, J.A. III at 1036-1202, J.A. IV at 1203-1509). We hold that none of the differences in the policies' language warrants different interpretations in this case
 
 
 [7]
 See note 4 supra
 
 
 [8]
 Insurance coverage issues are commonly resolved in declaratory judgment actions. See Wright & Miller, supra, at 2760
 
 
 [9]
 The district court found that 15 or 20 years can pass following an initial inhalation before asbestosis manifests itself. Longer periods of time can pass before mesothelioma or lung cancer manifest themselves. Keene Corp. v. Insurance Co. of N. America, 513 F.Supp. 47 (D.D.C.1981) memorandum op. at 3 (J.A. IX at 3533) (hereinafter cited as memorandum op.). Accord, Selikoff, Churg, & Hammond, supra note 3
 
 
 [10]
 Jurisdiction in this case exists under 28 U.S.C. § 1332 (1976) by virtue of the diversity of citizenship between the plaintiffs and each of the defendants. We find it unnecessary, however, to reach the issue of the applicable state law. The district court did not address the issue, nor did any of the parties raise the issue. This omission is apparently due to the fact that the potentially applicable state laws do not differ from one another
 Keene is incorporated in Delaware, has its principal place of business in New York, and is licensed to do business in the District of Columbia. INA is incorporated in Pennsylvania and has its principal place of business in Pennsylvania. Aetna is incorporated in Connecticut and has its principal place of business in Pennsylvania. Hartford is also incorporated in Connecticut and has its principal place of business in Connecticut. And Liberty is incorporated in Massachusetts and has its principal place of business in Massachusetts. None of the laws of these states gives us specific guidance in resolving this case, and the basic principles governing the interpretation of insurance policies are the same in each state. There is thus no conflict of laws. (There is what some have termed-somewhat confusingly-a "false conflict." See, e.g., R. Leflar, American Conflicts of Law 188 (3d ed. 1977); Comment, False Conflicts, 55 Calif.L.Rev. 74, 113 (1967).) Therefore, we need not engage in the exercise of identifying which jurisdiction's law governs. See Waters v. American Automobile Ins. Co., 363 F.2d 684, 687 (D.C.Cir.1966); Williams v. Rawlings Truck Line, Inc., 357 F.2d 581, 585 (D.C.Cir.1965).
 
 
 [11]
 See pp. 1051-1052 infra
 
 
 [12]
 Professor (now Judge) Keeton has suggested that the legal doctrines governing the construction of insurance contracts fit together under a more general, frequently unstated, principle that can be summarized as follows:
 The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.
 Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 961, 967 (1970). Professor Keeton argues that the principle is appropriate in view of the fact that an insurance policy is a contract of adhesion. Id. As applied to this case, we agree with Judge Keeton and explicitly base our interpretation of these policies on the expectations that Keene could have reasonably formed, as an objective matter, on the basis of the policies' language.
 
 
 [13]
 Keene's brief at 18
 
 
 [14]
 Id
 
 
 [15]
 Hartford also argues that the extent of an insurer's liability is limited by the proportion of exposure that occurred in its policy period, whereas Keene argues that, once an insurer's policy is triggered, the insurer is liable for the full loss. See pp. 1047-1049 infra. See also p. 1046 n.24
 
 
 [16]
 The Fifth Circuit also followed that case in Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir. 1981). In Insurance Co. of N. America v. Forty-Eight Insulations, 633 F.2d 1212 (6th Cir. 1980), aff'd on rehearing, 657 F.2d 814 (6 Cir. 1981), the issue of allocating indemnification expenses was not before the court. The district court in that case held that both defense and indemnification costs should be apportioned among the insurers and the insured on a pro-rata basis. Insurance Co. of N. America v. Forty-Eight Insulations, 451 F.Supp. 1230 (E.D.Mich.1978). The insured, however, only appealed the issue of apportioning defense costs to itself. The Sixth Circuit held that the defense costs should be apportioned on the same basis that the district court used to apportion indemnification costs. In Porter, it is unclear whether that court held that the insured must bear a pro-rata share of indemnification and defense costs
 For reasons discussed throughout this opinion, however, we decline to adopt the approach taken in those cases.
 
 
 [17]
 Workmen's compensation cases are only minimally instructive in construing comprehensive general liability policies. Those cases, only some of which adopt the manifestation approach, rely largely on the legislative intent behind workmen's compensation statutes. See General Dynamics Corp. v. Benefits Review Board, 565 F.2d 208, 212 (2d Cir. 1977); Travelers Insurance Co. v. Cardillo, 225 F.2d 137, 145 (2d Cir.), cert. denied, 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955). The cases that adopt the manifestation approach are based on "the overriding importance of efficient administration" in the workmen's compensation system. Cardillo, supra, 225 F.2d at 145. Although administrative feasibility must be one of our concerns in this case, it is not so "overriding" that we would be willing to accept the consequences that it would imply for the contracts before us
 Statute of limitations cases are not at all relevant. The date that a disease is deemed to occur for purposes of statutes of limitations is generally the date of manifestation. E.g., United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). If the date of a disease's origin were to begin statute of limitations periods, meritorious claims would be barred. As a matter of policy, courts have held that the purpose of the statutes of limitations-to protect defendants against stale claims-does not warrant barring such claims. See, e.g., id. at 117, 100 S.Ct. at 357; Urie v. Thompson, 337 U.S. 163, 169-71, 69 S.Ct. 1018, 1024-25, 93 L.Ed. 1282 (1949). The considerations involved in those cases have no bearing on the considerations relevant to this case.
 The health insurance cases are more relevant to this case. The only problem in those cases, however, is to determine when a disease begins in order to decide whether it began during a policy period. The cases hold that if a disease manifests itself during a policy period, then that policy covers the disease even if the origin of the disease can be traced back to a point in time prior to the policy period. See, e.g., Wilkins v. Grays Harbor Community Hospital, 71 Wash.2d 178, 427 P.2d 716 (1967); Reiser v. Metropolitan Life Insurance Co., 262 App.Div. 171, 28 N.Y.S.2d 283 (1941) aff'd, 289 N.Y. 561, 43 N.E.2d 534 (1942). In those cases, the security that the policies provided would be undermined if a disease were not covered by the insurer on the risk at the time the disease manifests itself.
 The court in Forty-Eight, supra note 16, expressed a similar opinion concerning the relevance of cases in these areas of the law. 633 F.2d at 1220-22.
 
 
 [18]
 This seems to be Hartford's theory. Hartford does not suggest that exposure in residence should trigger coverage
 
 
 [19]
 This would not be true of Keene's characterization of asbestos-related diseases as a series of discrete injuries beginning with inhalation exposure and continuing throughout the development of the disease. That characterization would imply the same conclusion that we reach, although perhaps not when Keene is held jointly and severally liable with other manufacturers. See note 20 infra. Such a characterization is, however, unnecessarily fact-bound. If a disease could be predicted to develop many years after inhalation of asbestos, yet no cellular changes were known to occur during that period, we would still hold that all policies are triggered from the point of exposure through the point of manifestation. In addition, by beginning with that characterization of the disease, Keene fails to develop the proper rationale for the result it seeks
 
 
 [20]
 The characterization of each exposure as a discrete injury must be rejected for yet another reason. In Borel v. Fibreboard Paper Prods., supra note 2., the court held that an asbestos-product manufacturer can be held jointly and severally liable for asbestos-related disease as long as its products had some causal relationship to the development of the disease. That means that a person who used Keene's products for one year, for instance, and then used other manufacturers' asbestos-containing products for several years, could recover damages from Keene for his total loss. If each exposure is considered a separate "injury," under the terms of the policies, one might be able to argue that each insurer is responsible only for the "injuries" that occurred during its policy periods, even though Keene, in effect, would be liable for "injuries" that occurred outside those policy periods, as a result of exposure to other manufacturers' products. It is unclear whether that is the holding in Forty-Eight, supra note 16, 633 F.2d at 1225, or whether that is Hartford's argument. It is clear, however, that such a result would be contrary to the terms of the insurance policies, which explicitly state that the insurer will pay "all sums which the insured shall become legally obligated to pay as damages because of bodily injury (during the policy period)." As long as there was either inhalation exposure or exposure in residence during a policy period, and as long as Keene must pay damages as a result, the insurer must indemnify Keene for whatever damages it must pay. That must be true even if Keene is obligated to pay for injury that may have occurred, in part, as a result of exposure to other manufacturers' products. To that extent, the terms of the policies incorporate evolving tort doctrines. The allocation of liability among Keene's insurers is addressed in section II-C, below
 Thus, rather than engaging in further heuristic constructs to avoid this inappropriate result, we have approached this problem in a straightforward manner that avoids the problem from the outset. We treat the diseases at issue in this case as single injuries that occur over extended periods of time.
 
 
 [21]
 Beginning in 1976, Liberty began using large deductibles and administrative fees for handling asbestos-damage claims. Memorandum op. p.2 n.2, p.6 (J.A. IX at 3532, 3536)
 
 
 [22]
 Although asbestosis has been known to man since the early 1900s, see note 25 infra, the general danger of prolonged exposure to asbestos fibers was not fully recognized until the late 1960s or early 1970s. See Insurance Co. of N. America v. Forty-Eight Insulations, supra note 16, at 1215. Keene stopped using asbestos in its products at about that time. Memorandum op. p. 1 (J.A. IX at 3531)
 
 
 [23]
 See p. 1044 supra
 
 
 [24]
 The other circuits that have considered this manifestation theory in the context of asbestos-related disease have also rejected the theory. See Porter v. American Optical Corp., supra note 16; Insurance Co. of No. America v. Forty-Eight Insulations, Inc., supra note 16. One district court, however, has adopted the manifestation theory. See Eagle-Picher Industries v. Liberty Mut. Ins. Co., 523 F.Supp. 110 (D.Mass.1981)
 
 
 [25]
 Theoretically, it would be possible to preserve Keene's rights under the policies if coverage were triggered at the point at which the dangers of asbestos inhalation were discovered. Such an interpretation, however, is not compelled by the terms of the policies and would be impossible to implement
 Keene did not raise the exposure-in-residence aspect of its argument below. Because we do not rely, however, on any legal or factual aspect of Keene's argument, see note 19 infra, we are not precluded from deciding that exposure in residence triggers coverage.
 
 
 [26]
 Apparently, the formula Hartford would propose is the following:
 number of years of exposure
 to Keene's products during
 Insurance company X's policy period Keene's
 company X's = --------------------------- X total
 pro-rata share Total number of years of liability
 exposure to Keene's products
 But see note 20 supra. Hartford argues that only inhalation exposure should be taken into account in prorating liability.
 
 
 [27]
 See pp. 1044 & n.20 supra
 
 
 [28]
 See pp. 1044 and 1046 supra
 The possibility of injury as a result of prolonged exposure to a substance was not unknown at the time these policies were issued. Cases of asbestosis were reported among asbestos textile workers early in the twentieth century, and by the 1930s it was well recognized that prolonged exposure to asbestos causes the disease. See Borel v. Fibreboard Paper Products Corp., supra note 2. See generally Selikoff, Churg, and Hammond, supra note 3 (discussion of asbestosis). Moreover, most of the policies explicitly recognize continuous exposure to certain conditions as an occurrence that can result in injury. They provide that such exposure within a single policy period is considered a single occurrence for purposes of the limit of liability provisions. Yet none of the policies provided that the insurer's liability would be limited in any way when exposure extends over several policy periods. The absence of such a provision supports our view that Keene could have reasonably expected complete security from each policy it purchased.
 
 
 [29]
 See pp. 1044, 1046 supra
 As Judge Wald points out, concurring op. at p. 1058 n.7, this interpretation of the policies provides the basis of our entire decision. She is correct in pointing out that it is an "indispensable initial premise of the liability theory (that we espouse)." Id. We rest our interpretation on the terms and principles of the insurance policies in issue. See pp. 1044, 1046 supra. Judge Wald's reliance on fairness in support of an alternative-but unstated-basic premise is appealing. Id. However, the contracts at issue in this case do not warrant such an independent appeal to fairness as a basis for deciding to allocate liability among all of the parties. At the same time, we see nothing unfair in holding that Keene is fully covered by each of the policies that it purchased.
 
 
 [30]
 The Sixth Circuit made the same point in Insurance Co. of N. America v. Forty-Eight Insulations, supra note 16, at 1225
 
 
 [31]
 This omission is particularly significant in the policies that explicitly recognize the possibility that injury can be caused by prolonged exposure to certain conditions. See note 28 supra
 
 
 [32]
 We recognize, however, that there is not a linear relationship between the number of years of coverage and the number of injuries that can be expected to be covered
 
 
 [33]
 See p. 1049 infra
 
 
 [34]
 We are further supported in our conclusion by the fact that Keene could be held fully liable for an asbestos-related injury even if a plaintiff's exposure to Keene's products was minimal compared to his or her exposure to other manufacturer's products. See Borel, supra note 2. If Keene were held fully liable under such circumstances, there would be no question but that whatever insurer was on the risk at that time could be held fully liable to Keene. Given that, it does not require too great a leap of logic to hold fully liable any insurer whose policy covers a particular injury. We need not confront the issue of an insurer's obligation if an injury for which the insured can be held liable is not indivisible as the diseases at issue in this case are
 
 
 [35]
 E.g.,
 (a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, INA shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each insurer has paid its limit in full or the full amount of the loss is paid.
 (b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, INA shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.
 J.A. II at 551.
 In addition, nothing we hold today bars insurers from collecting from one another under the doctrine of contribution.
 
 
 [36]
 The procedure by which this duty can be enforced is discussed in section E, below
 
 
 [37]
 Nothing we now hold should be read to prevent an insurer from sharing the costs of defense with other insurers under the "other insurance" clauses or under the doctrine of contribution
 
 
 [38]
 The construction that we adopt today should lead to far less complex tort suits than the district court's construction would have provoked. If each insurer and Keene had to bear pro-rata shares of total damage awards, all of them would have to join the other defendants (and their insurers) in each tort suit. Each suit would thus become an unwieldy spectacle. Within the plaintiff's suit for damages, groups of defendants would pursue disputes with each other. That result, which is not required by the contracts, would impose unnecessarily high costs on all parties-particularly the victim, who should not have to bear any of the cost of a dispute among Keene's insurers or between Keene and its insurers. We expect that these suits will be litigated more efficiently under the liability scheme we set forth today
 It should also be noted that we are not requiring that the company that defends Keene must also be the company whose policy limits determine the extent to which Keene may be indemnified. See p. 1049 supra.
 
 
 [39]
 This would also be true of other underlying tort doctrines such as enterprise liability, e.g., Hall v. E. I. Du Pont De Nemours, 345 F.Supp. 353 (E.D.N.Y.1972), or market share liability, e.g., Sindell v. Abbott Laboratories, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132, cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). See generally, Comment, 57 N.D.L.Rev. 81 (1981)
 
 
 [40]
 See Comment, Liability Insurance for Insidious Disease: Who Picks Up the Tab?, 48 Fordham L.Rev. 657, 691-92 (1980)
 
 
 [41]
 Preferably this would be done by affidavit or deposition
 
 
 [42]
 We recognize that the insured generally bears the burden of proving coverage. The injuries at issue in these cases, however, are unique and traditional procedural rules cannot be allowed to defeat Keene's or its insurers' substantive rights under the policies. We recognize that burdens of proof are matters of state law. Dick v. New York Life Ins. Co., 359 U.S. 437, 446, 79 S.Ct. 921, 927, 3 L.Ed.2d 935 (1959). We believe, however, that this case is so different from the cases in which the insured's burden of proof developed, that those cases provide no authority for this case. Reversal of the ordinary burden of proof will be more equitable for all parties and will prevent unnecessary litigation. The Sixth Circuit, in Insurance Co. of N. America v. Forty-Eight Insulation, supra note 16, also set out this procedure for litigating multiple-defendant suits for asbestos-related disease
 
 
 [43]
 Memorandum op. at 3 (J.A. IX at 3532)
 
 
 [44]
 Liberty's brief at 63-65
 
 
 [45]
 Keene's reply brief at 27-28. Endorsement No. 1 reads as follows:
 (t)he term named insured includes in addition to the person or corporation named in Item 1 of the declarations any business entity ... while the person or organization named in Item 1 of the declarations ... owns, during the policy period, an interest in such entity of more than fifty-percent (50%).
 J.A. III at 1047.
 
 
 [1]
 Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir. 1981) (hereinafter Porter )
 
 
 [2]
 Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir. 1980), 657 F.2d 814, aff'd on rehearing (6th Cir. 1981)
 
 
 [3]
 The United States District Court for the District of Massachusetts, however, determined that manifestation triggered coverage. Eagle Picher Industries, Inc. v. Liberty Mutual Insurance Company, et al., 523 F.Supp. 110 (D.Mass.1981)
 
 
 [4]
 The Fifth Circuit was not forced to resolve the question of whether the insured ought to be included within the pro rata distribution of liability. Porter, 641 F.2d at 1145
 
 
 [5]
 However, if liability exceeds the liability limit of the policy, then the majority would hold the manufacturer liable for the amount exceeding the limit
 
 
 [6]
 I agree, however, that the manufacturer may target one insurance company to defend the suit and that if judgment is awarded for the victim, the targeted insurance company must pay the victim to the extent of coverage and then seek contribution from other on-line insurers. I disagree only to the extent that self-insurers are excluded from contributing
 
 
 [7]
 The majority finds my position "problematic," but that is only because I have not made as long a "leap of logic" as it. Thus, I do not think that "Keene's rights (to be free of all liability) under the policies viewed in their entirety," are so much the product of a "logically prior determination," maj. op. at 1048, as they are the indispensable initial premises of the liability theory espoused in the opinion. Since I can find no first premises in the terms of the policies and canons of interpreting insurance policies, I must seek my own first premises in notions of fairness rather than in principles of logic. I cannot agree that it is fair to exempt self-insurers under these circumstances. I recognize the problems of working out the terms of a "self-insurance policy," but we should expect difficulties when we forge new ground. Certainly the majority's position entails its own share of implementation problems