**AMERICAN RECORD PRESSING COMPANY, Plaintiff,**

v.

**UNITED STATES FIDELITY & GUAR-ANTY COMPANY, Defendant.**

No. 74 Civ. 2876.

United States District Court, S. D. New York.

March 21, 1979.

Gwertzman & Pfeffer, New York City, for plaintiff; Max J. Gwertzman, Irwin Asofsky, New York City, of counsel.

Hogan, Jones & Parisi, New York City, for defendant; Brian S. Jones, New York City, of counsel.

## OPINION

GAGLIARDI, District Judge.

American Record Pressing Co. ("ARP"), a Michigan corporation formerly engaged in the manufacture of records and tapes and a wholly owned subsidiary of Viewlex Corp., commenced this action to recover $1,000,000 under a third party comprehensive liability insurance policy ("CEP policy") as a result of losses sustained in a fire at its factory in Owosso, Michigan on October 28, 1972. The CEP policy was issued by the defendant, the United States Fidelity & Guaranty Co. ("USF&G"), a Maryland corporation. Jurisdiction is premised upon diversity of citizenship, 28 U.S.C. § 1332. This action was tried to the court. The following constitutes the court's findings of fact and conclusions of law pursuant to R. 52(a), Fed.R. Civ.P.

### Statement of Facts

On August 19, 1970, USF&G issued special multi-peril policy No. A16679 ("SMP policy") to the plaintiff which, as amended June 3, 1972, provided coverage in the amount of $129,000 for losses to "machinery, equipment and customers' goods"[1] located at plaintiff's factory. In addition to this SMP policy, thirteen other SMP policies providing additional coverage in varying amounts of the same property were issued to the plaintiff by various other carriers.[2]

1. Prior to the June 3, 1972 amendment, the SMP policy covered "machinery, equipment, furniture, fixtures, inventory and customers' goods" located in the ARP factory. (Defendant's Exh. K).

2. The carriers and the policy numbers of the other SMP policies are listed below:

New Hampshire Insurance Group
Policy No. 11–56–09
Great American Insurance Company
Policy No. 2–20–62–95
Auto Owners Insurance Company
Policy No. 179427
Home Insurance Company
Policy No. FRG110686
Ohio Casualty Insurance Company
Policy No. SMP82678
Fireman's Fund American Insurance Company

Since the quantity and value of customers' goods held by ARP was subject to fluctuations, ARP officials periodically informed the insurers of the total amount of insurance they wished to have in effect at a given time. Several weeks before the Oct. 28, 1972, fire, James Shanahan, comptroller of Viewlex, under instructions from Norman Dufour, President of ARP, notified the fourteen SMP insurers that the value of customers' goods on hand at the ARP plant was $501,000, a figure representing manufacturer's cost and not fair market value. At the time of the fire, the total amount of coverage of the fourteen SMP policies was $1,434,000. These SMP policies also contained a 100% co-insurance clause requiring ARP to be insured at full value or become a co-insurer for any loss in excess of the insured value.

The defendant subsequently issued two other policies with different coverage to the plaintiff: 1) on September 15, 1971, Special Multi-peril Policy No. 340310 ("Policy No. 340310") (Plaintiff's Exhibit 8) covering business interruption losses up to $50,000 and personal property (consisting of "stock and furniture and fixtures") losses up to $200,000 and 2) on March 13, 1972, Comprehensive Excess Liability Policy No. 19149 ("CEP policy") having an occurrence limit of $1,000,000. The present claim is brought under the CEP policy which defined its coverage as follows:

> 3.1. COVERAGE. The Company will indemnify the insured for all sums which the insured shall become obligated to pay as damages and expenses . . . by reason of liability imposed upon the insured by law, or by contractual liability, because of (1) personal injury or property damage caused by . . . an occurrence which takes place anywhere.

Policy No. F1729743
The Cincinnati Insurance Company
Policy No. 482567
State Mutual Cyclone Insurance Company
Policy No. 361934
Royal Insurance Company Limited
Policy No. WKF648570
The Buckeye Union Insurance Company

The policy also provided that, as an excess policy, it became operative only in situations in which the "ultimate net loss resulting from any one occurrence [exceeds] . . . the underlying limit . . ." (CEP policy § 3.2). The "underlying limit" was in turn defined as "insurance policies described in Section 1.7 . . . and the insurance available to the Insured under any other insurance policy applicable to the occurrence" (*Id.* § 2.15).

The fire that occurred at the plaintiff's plant on October 28, 1972 caused severe damage to the physical structure of the plant and its contents. The parties agree that Policy No. 340310, the SMP, and the CEP policy were in effect at the time (Tr. 2-3). Approximately six weeks after the fire, ARP retained Gerald Marshall, President of Goldstein Associates, to adjust its loss (Tr. 133). ARP initially submitted proofs of loss to its machinery and equipment in the amount of $1,188,920 and to customers' goods in the amount of $1,222,-974—a total claim of $2,411,894. The carriers retained the General Adjustment Bureau (GAB) to adjust the loss on their behalf, with Holt Derrick acting as supervising adjuster. After the claims were reviewed and audited, Marshall and Derrick agreed upon the following valuations: $813,885 for losses to machinery and equipment, and $988,913 for losses to customers' goods, a combined audited claim of $1,802,-798 (Tr. 92). In determining the portion of the $1,802,798 adjusted loss covered by the SMP policies, the insurers invoked the 100% co-insurance clause. The parties agreed that in order to avoid invocation of the co-insurance clause, ARP should have had coverage of at least $1,848,072 representing the audited loss of $1,802,798 and salvage value of $45,274. Accordingly, at a meeting on October 2, 1973 the SMP carriers and Viewlex agreed upon a figure of $1,398,870

Policy No. FDP2201908
Badger State Mutual Casualty Company
Policy No. F2-6343
Trans America Insurance Company
Policy No. F5585234
The Hamilton Mutual Insurance Company
Policy No. 100284

as the SMP carriers' liability under their policies.

Long before this figure was agreed to, however, ARP's customers became impatient at the delay in receiving payment of their losses from the fire. Shanahan testified that the customers began sending letters to ARP stating that they had not received payment for their losses and deducting the amount of their losses from the amounts they owed to ARP or other Viewlex subsidiaries. (Defendant's Exhibits C and D). Each of these letters was identical except for the customer's name, signature and amount of the claimed loss. (*Id.*) While Shanahan initially testified that the claim letters were authored by ARP customers (Tr. 71-72), he admitted on cross-examination that he had prepared all of the letters himself (Tr. 73, 75).

Shanahan also testified that after recognizing that ARP was negligent in not having adequate coverage to insure fully the loss under the SMP policies, he and David Peirez, the president of Viewlex, and Leslie Levine, the assistant secretary of Viewlex, determined that the proceeds of the SMP policies should be first applied to satisfy ARP's losses to its machinery and equipment (Tr. 67-68). The ARP officials further concluded that they would permit customers to credit their accounts in the amount of their losses, and that ARP would make a claim under the CEP policy to recoup the total amount of the customer credits. Evidence was introduced at trial showing that these credits totalled $873,818.01.[3] Shanahan also testified that ARP did not give notice of this set-off arrangement to USF&G or to any of the carriers' agents (Tr. 57-61).

In August 1973 the SMP carriers made an advance payment of $500,000 on account to ARP and the balance of $898,870 was paid at the October 2, 1973 meeting. Upon delivery of the second payment, ARP turned over to the carriers receipts, releases and discharges executed by ARP customers which acknowledged the receipt of unspecified good and valuable consideration and released and discharged the named SMP carriers from any claims which the customers had either against the carriers under SMP policies or against ARP. (Defendant's Exhibits A & C). The releases specifically reserved to the customers any rights or claims they might have against the carriers and ARP with respect to any other policies of insurance.

There was conflicting testimony offered at trial on the issue of whether or not the SMP carriers specified that the $500,000

---

**3.** This figure is based upon the sum of the credits that seven of ARP's customers deducted from outstanding bills:

| Customer | | Amount of Claimed Set-Off |
|---|---|---|
| Avco | | 59,381.95 |
| Columbia | | 4,781.65 |
| Buddah | | 438,242.56 |
| Bell | | 49,909.40 |
| Stax | | 315,230.26 |
| Old Homestead | | 600.00 |
| London | | 5,672.19 |
| | Total | 873,818.01 |

These credits were embodied in letters allegedly sent by the customers to ARP and were introduced into evidence as Exhibits C and D.

Although the record reveals that other customers had goods located in plaintiff's factory at the time of the fire (see, e. g. Tr. at 59–60, 73–75, 146–47) (Pickwick International and Gamble Records), and that the fourteen SMP carriers obtained releases from three customers other than those whose letters of set-off are contained in Exhibits C and D (Hot Wax, Sussex, and Music Merchants), no evidence was introduced at trial establishing that any of these or any other customers actually deducted the amounts of their fire losses from outstanding bills. Proof that customers other than those whose letters comprise Exhibits C and D had unaudited losses as represented by the worksheet of plaintiff's auditor (Plaintiff's Exhibit 2) clearly does not establish that these customers actually credited their accounts with Viewlex subsidiaries for these amounts. Furthermore, Plaintiff's Exhibit 7, which allegedly provides a complete schedule of customers' set-offs, was never offered into evidence at trial. It should be noted, however, that even if proof of other set-offs was introduced at trial, the total amount of set-offs could not exceed the audited amount of customer losses under the SMP policy of $988,913. Plaintiff's decision to reimburse its customers by set-off rather than by cash payments could not be permitted to vitiate the effect of the proper investigation and audit under the SMP policy.

advance payment was attributable to a particular loss. Derrick testified that the insurers told the plaintiff that his payment was to be applied only to plaintiff's machinery and equipment loss (Tr. 204), leaving an unpaid balance on plaintiff's own audited loss of $313,885 (GAB Report 8/13/73). Shanahan and Levine, in contrast, testified that the insurers never indicated that this or any other payment was to be allocated to any specific property: "it was just one lump sum figure, one million, three hundred and ninety eight. There was nothing allocated between the records and the machinery and equipment" (Shanahan Tr. at 87); the parties expressly "agreed not to itemize" the final settlement (Levine Tr. at 107). The court determines that the testimony of Shanahan and Levine represents the more accurate description of the August advance. This finding is based upon the demeanor of the witnesses at trial and a careful review of the record. Furthermore, it seems highly unlikely that the carriers would have requested ARP to satisfy its own losses first regarding the August advance when nothing in the record indicates that the carriers extracted a similar promise regarding the remaining proceeds paid to ARP at the October 2, 1973 meeting.

From the proceeds of the SMP insurance money, ARP reimbursed two of its customers, Motown Records and Encyclopedia Britannica, $16,248.34 and $21,379.73 respectively for their losses arising out of the fire, and paid Savings Bank of Owosso $277,-973.30 in satisfaction of a lien on the destroyed machinery and equipment (Tr. 9, 42, 56, 63). The balance of the insurance proceeds, $1,083,268.43, an amount in excess of ARP's audited loss, was credited to the accounts of ARP and Viewlex as reimbursement for the set-offs given to ARP's customers for their losses.

The CEP policy contains the following provisions:

### 5.3. INSURED'S DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT.

.  .  .  .  .

If claim is made or suit is brought against the insured relating to an occurrence likely to involve the insurance afforded by this policy, the insured shall immediately notify the Company in writing and forward to the underlying insurer and to the Company every demand, notice, summons or other process received by him or his representative.

### 5.4. DEFENSE; SETTLEMENT.

When in the judgment of the Company an occurrence may involve damages in excess of the applicable underlying limit, the Company may elect at any time to participate with the insured and with the underlying insurers in the investigation, settlement and defense of all claims and suits in connection therewith. After the exhaustion of any applicable limit of underlying insurance, the Company shall have the option to defend, at its own expense, any suit seeking to impose liability with respect to which insurance is afforded under this policy; and the Company may make such investigation and settlement of any claim or suit as it deems expedient."

The policy also states that "no action shall be brought against the Company unless as a condition precedent thereto, there shall have been full compliance with all the terms of this policy .  .  . " (CEP policy § 5.5). Conflicting testimony was offered at trial regarding whether or not plaintiff complied with these conditions. While admitting that no formal written notice was ever given, plaintiff alleges that it substantially satisfied this requirement by giving actual oral notice of the possibility of claims under the excess policy to two of defendant's agents: Jack Bremer, an employee of Cadwallader-Lord-Hahn who wrote the insurance policy for USF&G and Kenneth Davies, an attorney for the carriers. Marshall and Shanahan both testified that Bremer was told that ARP "would probably be going against the excess [policy]" at a meeting in Bremer's office shortly after the fire. (Marshall Tr. at 136) (Shanahan Tr. at 23, 27). After the October 1973 meeting at which the settlement was finalized, Dufour, the President of ARP, sent a letter to Bremer in which he stated:

We have just completed our claim on customers' goods and machinery and equipment today.

The losses presented to the insurance company adjusters are as follows:

1) customers' Goods $_____
2) machinery and equipment $_____
3) Debris removal $_____
             $_____

As you can see, the losses exceed our property damage insurance by a considerable amount. We understand that you have advised the USF&G under policy CEP 19149 (Umbrella Policy) of a potential claim.

Please advise if any further Proof of Claim is required at this time.

Thank you.

N.D.

Plaintiff also contends that Davies had actual oral notice of ARP's potential CEP claim. Levine testified that he discussed the CEP policy with Davies before drafting the customer release forms (Tr. at 103). Davies knew that the forms included a provision under which the customers "reserved rights" to go after USF&G for the balance of their claims (Marshall Tr. at 138–40) (*See also* Levine at 99–104).

## Discussion

### A. *LIABILITY UNDER THE CEP POLICY*

#### 1. *Choice of Law*

■ The threshold question involves a determination of the governing law. The parties agree that Michigan law should be applied to resolve their respective rights and liabilities arising from the operation of the insurance policies at issue in this suit. (Tr. at 225). This position is in accordance with New York's prevailing conflicts of law rule, *see Klaxon Co. v. Stenton Electric Mfg. Co.,* 313 U.S. 487, 62 S.Ct. 1284, 86 L.Ed. 1757 (1941), regarding the interpretation and operation of contracts. It is clear that Michigan, as the state in which the insured is incorporated as well as the place where the CEP policy was entered into and

the loss occurred, has the most significant contacts with the lawsuit. *Auten v. Auten,* 308 N.Y. 155, 140 N.Y.S.2d 82, 124 N.E.2d 99 (1954); *Colonial Penn Insurance Co. v. Minnkoff,* 40 App.Div.2d 819, 338 N.Y.S.2d 444, aff'd. 33 N.Y.2d 542, 347 N.Y.S.2d 437, 391 N.E.2d 424 (1973). *See also Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969).

#### 2. *Allocation of SMP Insurance Proceeds between Bailee and Bailor Losses*

Plaintiff seeks to recover under the CEP policy $873,818.01, the total amount of credits that it permitted its customers to deduct from the amounts that they owed to ARP or other Viewlex subsidiaries.[4] The express terms of the CEP policy, however, limits USF&G's liability to the amount of third party liability suffered by ARP which is not covered by other insurance. Determining this amount is made difficult by the fact that the underlying insurance, the SMP policies, do not indicate the manner in which ARP must distribute the proceeds of the policies in situations in which the proceeds are insufficient to cover losses to ARP and its customers. Thus, this court must determine whether, under Michigan law, ARP, as bailee of its customers' goods, could use unallocated proceeds of the SMP policies to satisfy first its own losses when the proceeds under these policies were insufficient to cover losses to both ARP and its customers.

■ Neither counsel's nor the court's independent research has found a Michigan decision that has directly addressed this issue. Nevertheless, it is the rule in this Circuit that

even though a state's relevant law is unclear or difficult to ascertain, it is still our duty to render a decision by attempting to apprehend the result that that state's courts would reach, *see Bernhardt v. Polygraphic Co. of America, Inc.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199

---

4. *See* note 3 *supra.*

(1956), and where the relevant law is interstitial, we may look for guidance "to such sources as the Restatements of Law, treatises and law review commentaries, and the 'majority rule.'"

*Patch v. Stanley Works,* 448 F.2d 483 (2d Cir. 1971) *citing* C. Wright, *Federal Courts,* § 58 at 208 (1963); *cf. Delaney v. Towmotor Corp.,* 339 F.2d 4 (2 Cir. 1964). *See also Schein v. Chasen,* 478 F.2d 817 (2d Cir. 1973) vacated 414 U.S. 1062, 94 S.Ct. 568, 38 L.Ed.2d 467 (1974); *Holt v. Seversky Electronatom Co.,* 452 F.2d 31 (2d Cir. 1971); *Raymond v. Eli Lilly & Co.,* 412 F.Supp. 1392 (1st Cir. 1976); 1A Moore's *Federal Practice* ¶ 0.309[2].

■ Although some early courts held that a bailee could satisfy its own loss claim fully before the bailor was entitled to any of the insurance proceeds, *see, e. g.* 5 R. Couch, *Cyclopedia of Insurance Law* § 29.57 at 340 n.10 (2d ed.1966), the majority of courts and commentators have considered this view "no longer tenable". Patterson, *Essentials of Insurance Law* § 28 at 129 (2d ed. 1957); 5 R. Couch, *Cyclopedia of Insurance Law,* § 29.57 at 339 (2d ed. 1966); *Annotation,* Rights in Proceeds of Insurance Taken Out by Warehouseman on Goods Stored, 53 A.L.R. 1409, 1412–15 (1928) and cases cited therein. *But see* 5A J. Appleman, *Insurance Law & Practice* § 3333 at 132 n. 46–48 (2d ed. 1962). The authorities that have refused to give the bailee priority over the insurance proceeds, however, have done so based upon two different theories. Some authorities have held that the bailee, after satisfaction of its liens on the goods,[5] serves as trustee of the unallocated proceeds and is obligated to satisfy the bailor's loss before it satisfies its own. *See, e. g. Stillwell v. Staples,* 19 N.Y. 401; *DeForest v. Fulton Insurance Co.,* 1 Hall (N.Y.) 84 (1828); *Penn v. Commercial Union Fire Insurance Co.,* 233 Miss. 178, 101 So.2d 535. Other authorities have held that

the bailor and the bailee are entitled to share the proceeds in proportion to the value of their respective interests ("the pro rata approach"). *See, e. g. United States Fidelity & Guaranty Co. v. Slifkin,* 200 F.Supp. 563, 575 (N.D.Ala.1961); *Edwards v. Cleveland Mill & Power Co.,* 193 N.C. 780, 138 S.E. 131 (1927); *Johnston v. Charles Abresch Co.,* 123 Wis. 130, 101 N.W. 395 (1904); *Boyd v. McKee,* 99 Va. 72, 37 S.E. 810 (1901); *Smith v. Carmmack,* 64 S.W. 372 (Tenn.Ch.1901); *Ferguson v. Pekin Plow Co.,* 141 Mo. 161, 42 S.W. 711 (1897); *Beidelman v. Powell,* 10 Mo.App. 280 (1881); *Snow v. Carr,* 61 Ala. 363, 32 Am.Rep. 3 (1973); *Siter v. Morrs,* 13 Pa. 218 (1850). Exercising its judgment, as it must in accordance with the teachings of *Bernhardt v. Polygraphic Co., supra,* and *Stanley Works, supra,* the court determines that the Michigan Supreme Court, if it were confronted with this issue, would adopt the pro rata approach for several reasons. First, the scholarly literature on the subject appears to consider this approach to be the prevailing rule of law. *See* Patterson, *Essentials of Insurance Law, supra. See also* 5 R. Couch, *Cyclopedia of Insurance Law, supra; Annotation,* Rights in Proceeds of Insurance Taken Out by Warehouseman on Goods Stored, *supra.* Second, Michigan courts have repeatedly held that insurance contracts should be interpreted in the manner most favorable to the insured party regarding matters on which the policy is either silent or ambiguous.[6] *See, e. g., Nickerson v. Citizens Mutual Insurance Co.,* 393 Mich. 324, 224 N.W.2d 896 (1977); *Palmer v. Pacific Indemnity Co.,* 74 Mich. App. 259, 254 N.W.2d 52 (Mich.App.1977); *Dittus v. Geyman,* 68 Mich.App. 433, 242 N.W.2d 800 (Mich.App.1976). As between the two approaches that have gained acceptance, the pro rata approach is more beneficial to the insured party in situations in which the proceeds are insufficient to

---

**5.** Such liens arose due to storage charges that the bailor owed to the bailee apart from the issue of the allocation of insurance proceeds.

**6.** It should be pointed out that while it is likely that a Michigan court would use this rule of

construction to choose between two otherwise acceptable views, it is doubtful that it would permit a rule of construction to supplant an approach that has been disfavored by the majority of the courts and commentators.

compensate fully both parties and thus is more in line with Michigan's rule of construction favoring the insured. Lastly, the pro rata approach seems particularly appropriate in a situation, such as this one, in which the insured party did not procure the SMP policies *primarily* for the benefit of *either* itself or its customers. *See Robert Williams & Co. v. Auto Export Co.,* 78 N.J.Eq. 165, 78 Atl. 670 (1910). Indeed, ARP obtained the insurance to cover damages to *both* parties' assets. Nor was the ARP's coverage of customers' goods gratuitous or necessarily intended to cover only a small portion of customer property. Testimony at trial revealed that it was the customary practice in the record pressing industry for the record manufacturer to insure its customers' goods which, in the usual course of business, were left on the manufacturer's premises until customers sent shipping instructions (Dufour Tr. at 116–18, Steinmetz Tr. at 129, Cohen Tr. at 132). Thus, the court concludes that a Michigan court would apply the pro rata approach in a comparable situation.

The court has already determined that the August 1973 advance was not earmarked for any particular loss. Applying the pro rata approach to the full amount of the SMP policy proceeds, $1,398,870, ARP was entitled to receive $631,528.95 as its own pro rata share of the proceeds and it

should have paid out $767,340.90 to its customers.[7] Instead, ARP made cash payments of $37,628.07 to two of its customers—Motown and Encyclopedia Britannica—and gave its other customers credits against bills of $873,818.01 that they owed either to ARP or another Viewlex subsidiary. Thus, the total amount that ARP paid to its customers in satisfaction of their claims was $911,446.08.[8] Since this court has determined that Michigan law would obligate ARP to pay its customers a pro rata share of the SMP proceeds of $767,340.90, plaintiff's claim under the CEP policy must be limited to an amount of third party liability ARP incurred in excess of this amount. Thus, barring the successful assertion of affirmative defenses, ARP would be entitled to recover $144,105.18 under the CEP policy.

### B. *AFFIRMATIVE DEFENSES*

■■ USF&G, however, raises two such affirmative defenses to ARP's recovery on the CEP policy. First, it contends that the loss ARP suffered by the customer set-off procedure is not covered by the policy because ARP's obligation to pay its customers was not "imposed upon the insured by law" (CEP policy ¶ 3.1). USF&G interprets this clause in the CEP policy as permitting recovery only where there has been a judicial

---

7. The following formula was used to allocate the SMP proceeds in proportion to the relative losses:

$$\frac{\text{amount of party's unsatisfied audited loss covered by SMP}}{\text{total amount of unsatisfied audited losses covered by SMP}}$$

$$\times \text{ unallocated SMP proceeds}$$

In the case of ARP, for example, the formula works as follows:

$$\frac{813,885}{1,802,798} \times 1,398,870$$

It should also be noted that the amount of ARP's unsatisfied losses to its "machinery, equipment, and customer goods" under the SMP policies does not have to be reduced by the amount of the payments ARP received under Policy No. 340310. Unlike the SMP policies, this policy only covered "business interruption losses" and losses to ARP's "stock, furniture and fixtures" (*See* Plaintiff's Exhibit 8, Amendment to MLB 100 (2–71) Gen.Property Form).

8. It should be noted that this figure is still below $988,913, the audited value of customer losses resulting from the fire. Defendant asserts that:

> It should be remembered that as a result of [its] investigation, a settlement figure was reached at $988,913 for customer goods. USF&G and thirteen other companies paid those claims, got releases for the same, and

had every right to expect that ARP would pay the proceeds over to the customer who had sustained the loss.

(Defendant's Trial Brief at 30–31). USF&G, however, could have turned "its expectancy" into "ARP's obligation" had the SMP and CEP policies not been silent on the issue of priority of claims when the property was underinsured.

determination against the insured based upon fault. The court cannot adopt this construction of ¶ 3.1. Such an interpretation is contrary to the general rule followed by Michigan courts that the language of an insurance policy should be interpreted according to its ordinary usage in order to avoid forced or strained meanings. *See, e. g., P. L. Kanter Agency, Inc. v. Continental Casualty Co.,* 541 F.2d 519 (6th Cir. 1976); *Cora v. Patterson,* 55 Mich.App. 298, 222 N.W.2d 221 (Mich.App.1974). *Cf. Brooklyn Clothing Corp. v. Fidelity Phoenix Fire Insurance Co.,* 205 App.Div. 743, 200 N.Y.S. 208 (2d Dep't 1923) (New York law) (the phrase "legal liability" in a policy embraces the liability which bailee assumed upon receipt of goods from owner).[9]

Defendant's second defense is that plaintiff failed to comply with the notice provisions of § 5.3 of the policy and that compliance with these provisions is a condition precedent to maintaining an action against the carrier. More particularly, defendant contends that ARP (1) failed to give USF&G immediate written notice of claims made by ARP customers relating to losses sustained in the fire and that (2) such lack of notice prevented USF&G from participating in the investigation, settlement and defense of third party claims in excess of the underlying insurance in violation of section 5.4. ARP's failure to give the required "immediate" notice does not bar its recovery since under Michigan law such a provision is interpreted to require only notice within a "reasonable time." *Kermans v. Pendleton,* 62 Mich.App. 576, 582, 233 N.W.2d 658, 661 (Mich.App.1975), *citing Wendel v. Swanberg,* 384 Mich. 468, 185 N.W.2d 348 (1971); *Kennedy v. Dashner,* 319 Mich. 491, 30 N.W.2d 46 (1947). Michigan law also provides that notice to an authorized agent is notice to the insurer. *Wendel v. Swanberg, supra,* 384 Mich. at 478, 185 N.W.2d at 352 n.7 *citing Hawkeye*

*Casualty Co. v. Holcomb,* 302 Mich. 591, 5 N.W.2d 477 (1942) and M.C.L.A. § 500.3008 (Stat.Ann.1957 Rev. § 24.13008). There was ample evidence at trial that two of defendant's agents, Jack Bremer and Kenneth Davis, had notice "shortly after the fire" that ARP "would probably be going against the excess policy" (Marshall Tr. at 136) (Shanahan Tr. at 23, 27). This conversation was later confirmed by the memorandum sent by Norman Dufour to Jack Bremer after the parties reached a final settlement under the SMP policy in October 1973. Nothing in the record indicates that USF&G had notice of the amount of, or the specific nature of the claims, that would be serving as the basis for ARP's subsequent action against the CEP policy. Nevertheless, Michigan law still requires the carrier to demonstrate that it has been prejudiced by the delay or inadequacy of the notice in order for it to state a valid defense to an action for payment under an insurance policy. *See Kermans v. Pendleton, supra* 62 Mich.App. at 580, 233 N.W. at 661, *citing Wendel v. Swanberg, supra* 384 Mich. at 478, 185 N.W.2d at 353; *Wehner v. Foster,* 331 Mich. 113, 49 N.W.2d 87 (1951). Michigan courts have repeatedly stated that the purpose of notice provisions, similar to those at issue here, is "to allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid or excessive claims." *Wendel v. Swanberg, supra* 384 Mich. at 478, 185 N.W.2d at 352. *See also Wehner v. Forest, supra,* 331 Mich. at 120, 49 N.W.2d at 90; *Kennedy v. Dasher, supra,* 319 Mich. at 494, 30 N.W.2d at 47. Although the court recognizes that each of the USF&G–ARP insurance policies served different functions and gave rise to varying obligations, it cannot ignore the fact that the defendant, as one of the fourteen underlying insurers of the SMP policies, had an opportunity to and did in fact evaluate

---

**9.** In addition, the record indicates that the defendant may have admitted that the CEP policy covered the loss even though there had not been a judicial determination against ARP based upon its own negligence. At the close of trial, the following dialogue occurred:

*The Court:* . . . The only other thing is whether or not I think if there is a responsibility on the part of the defendant; it is agreed that the fire that occurred is covered by this loss, this policy.
*Mr. Jones:* Yes.
(Tr. at 230).

claims by ARP customers for losses incurred in the fire. A year long investigation and audit reduced the value of customer losses by over $200,000 (Tr. at 6–8). The burden is on the insurer to demonstrate that it has been prejudiced by the insured's noncompliance with the notice provisions in the policy. *Wendel v. Swanberg, supra,* 384 Mich. at 478, 185 N.W.2d at 353. USF&G adduced no evidence showing that it was prevented from making a timely investigation of the fire or amount of claim in order to defend against excessive claims. Thus, the court simply "cannot presume [that USF&G] would have proceeded any differently had it been notified earlier." *Bibb v. Dairyland Insurance Co.,* 44 Mich.App. 440, 205 N.W.2d 495, 498 (1973).

Accordingly, plaintiff has proved a valid claim under the CEP policy in the amount of $144,105.18. Submit judgment on five days' notice.

So Ordered.