**ELI LILLY AND COMPANY, Plaintiff,**

v.

**The HOME INSURANCE COMPANY,
et al., Defendants.**

Civ. A. No. 82–0669.

United States District Court,
District of Columbia.

Apr. 12, 1984.

Michael A. Nardolilli, Baker & Daniels, Washington, D.C., Theodore R. Boehm, Christopher G. Scanlon, Baker & Daniels, Indianapolis, Ind., for Eli Lilly and Co.

Herbert J. Miller, Jr., Stephen L. Nightingale, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for the Aetna Casualty and Surety Co., Pacific Indem. Co., Federal Ins. Co.

Lawrence E. Carr, Jr., James F. Lee, Jr., Carr Goodson & Lee P.C., Washington, D.C., for the Travelers Indem. Co.

James Schaller, Elizabeth Medaglia, Jackson & Campbell P.C., Washington, D.C., for American Home Assur. Co., Lesington Ins. Co., The Ins. Co. of the State of Pennsylvania, Nat. Union Fire Ins. Co. of Pittsburgh.

Sheila L. Birnbaum, Skadden, Arps, Slate, Meagher & Flom, New York City, John M. Nannes, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for Home Ins. Co.

Richard H. Gimer, Hamel & Park, Washington, D.C., for Mutual Fire, Marine & Inland Ins. Co., Commercial Union Surplus Lines Ins. Co., American Employers' Ins. Co.

Dennis M. Flannery, A. Stephen Hut, Wilmer, Cutler & Pickering, Washington, D.C., for Ins. Co. of North America, Indem. Ins. Co. of North America, Cal. Union Ins. Co., Horace Mann Ins. Co.

G. Marshall Moriarty, Ropes & Gray, Boston, Mass., Thomas M. Susman, Ropes & Gray, Washington, D.C., for Allen Peter Denis Haycock and Certain other Underwriters at Lloyd's and Companies in the London Market.

Brian C. Shevlin, Shevlin & Curtis, P.C., Fairfax, Va., for Interstate Fire & Casualty Co., Interstate Indem. Co.

R. Harrison Pledger, Jr., McLean, Va., for St. Paul Fire and Marine Ins. Co.

Brendan V. Sullivan, Jr., John J. Buckley, Jr., Williams & Connolly, Washington, D.C., for American Motorists Ins. Co., Lumbermens Mut. Casualty Co.

Donald M. Gilberg, Levy, Bivona & Cohen, Washington, D.C., Jeffrey Kaufman, Hall, Henry, Oliver & McReavy, San Francisco, Cal., for Firemen's Fund Ins. Co.

William A. Ehrmantraut, Donahue, Ehrmantraut & Montedonico, Chartered, Rockville, Md., for Zurich Ins. Co.

Michael Nussbaum, Earl C. Dudley Jr., Nussbaum Owens & Webster, Washington, D.C., for Paul Malcom Johnson and certain other Underwriters at Lloyd's and Companies in the London Market.

James W. Greene, Bromley, Brown & Walsh, Washington, D.C., for Intern. Surplus Lines Ins. Co., Cen. Nat. Ins. Co. of Omaha, Continental Ins. Co., Continental Cas. Co.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiff Eli Lilly and Company moves this Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.). Defendants, Lilly's insurers from 1947 to July 15, 1976, vigorously oppose the motion. For the rea-sons set forth in this Opinion, the Court finds that there is no genuine issue as to any material fact and Lilly is entitled to judgment as a matter of law. Accordingly, the motion of plaintiff for summary judgment is granted.

## BACKGROUND

Eli Lilly is one of several hundred manufacturers of products containing the drug diethylstilbestrol (DES).[1] Between 1947 and 1967, Lilly manufactured and sold DES for prescription use by women with a history of threatened or habitual miscarriages.[2] In 1970, a statistical association was shown between the ingestion of DES by pregnant women and the occurrence of vaginal clear-cell adenocarcinoma in the female offspring exposed *in utero* to DES.[3] Since the discovery of this association, Lilly's liability for clear-cell adenocarcinoma and other DES-related diseases has become the subject of voluminous litigation. Indeed, as of March 1, 1983, approximately 641 lawsuits had been filed against Lilly.[4]

In the typical case, the plaintiff, a DES-daughter, alleges that her mother ingested DES during pregnancy and her *in utero* exposure to DES caused a DES-related injury. The most common injuries alleged by plaintiffs are vaginal or cervical clear-cell adenocarcinoma and vaginal adenosis.[5] Lil-

---

**1.** DES, the first synthetic estrogen, was synthesized in 1938 by Dr. E.C. Dodds and his colleagues at Oxford and Cambridge, England. In 1941, the Food and Drug Administration (FDA) approved Lilly's New Drug Application for DES for certain nonpregnancy indications.

**2.** FDA permitted Lilly to market DES as a prescription drug for the treatment of threatened or habitual miscarriage in September 1947. In 1952, FDA informed Lilly that DES was "no longer a new drug" within the meaning of the Federal Food, Drug, and Cosmetic Act § 201(p), 21 U.S.C. § 321(p) (1982). A drug is "no longer a new drug" under the Act when it is generally recognized by experts in the field as safe and effective for its intended purpose. *Id. See also, Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *United States v. An Article of Drug Entrol–C Medicated,* 513 F.2d 1127 (9th Cir.1975).

**3.** Drs. Arthur L. Herbst and Robert E. Scully first reported the statistical association. *See*

Herbst & Scully, *Adenocarcinoma of the Vagina in Adolescence: A Report of 7 Cases Including 6 Clear Cell Carcinomas (so-called mesonephromas),* 25 Cancer 745–57 (1970). Since the Herbst and Scully Report, other researchers have reported correlations between the ingestion of DES during pregnancy and the appearance years later of abnormalities in the male or female child of that pregnancy. *See e.g.,* Stafl & Mattingly, *Vaginal adenosis: A Precancerous Lesion?,* 120 Am.J.Obstet.Gynecol. 666–73 (1974). In 1971, FDA required pharmaceutical manufacturers to contra-indicate DES for use in treating certain complications of pregnancy.

**4.** 362 of these suits were pending as of March 31, 1983.

**5.** Adenosis, a noncancerous condition, is the presence of normal columnar cells in an unusual location in the vagina. *See generally,* Johnson, Driscoll, Hertig, Cole, & Nickerson,

ly also has been named as a co-defendant with other manufacturers of DES in cases where a plaintiff is unable to identify the manufacturer of the particular synthetic estrogen that allegedly caused the injury.[6] These cases are not uncommon since several years elapse between the ingestion of DES by a pregnant woman and the diagnosis of a DES-related disease in the male or female child of that pregnancy.[7]

Lilly notified defendants of the various DES claims filed against it.[8] The general position of each of the insurers is, however, that its policy does not provide coverage for these claims since the proper date of the alleged DES-related injury did not occur during the policy period.[9] In this action for declaratory judgment, Lilly seeks a judgment declaring that 1) each policy in force from the date of ingestion of DES until the manifestation of an alleged DES-related injury provides full coverage to Lilly for the entire amount of its indemnifiable losses and expenses, subject only to those underlying dollar limits of liability contained in each policy; 2) Lilly may elect under which of the policies in force it will file each claim; 3) the insurer which issued the policy that Lilly elects must pay the full amount of Lilly's indemnifiable losses and expenses with prejudgment interest as permitted by law; and 4) the participation or contribution by other insurers whose policies are in force during the period of coverage shall be the responsibility of the insurers and shall not impede or detract from Lilly's ability to receive indemnification.

## The Policies

Lilly's product liability insurance policies with defendants are "manuscript" policies written specifically for Lilly.[10] However, the provision in each of these policies providing for liability coverage is identical in all material respects to the coverage provision in the Comprehensive General Liability Policy (CGL). The CGL is a standard form policy for liability coverage drafted during the 1960's by representatives of the insurance industry to deal with the problem of liability for insidious diseases; that is, illnesses which become manifest long after initial exposure to the substance believed to cause them.[11] Both the 1966 version of the

Vaginal Adenosis in Stillborns and Neonates Exposed to Diethylstilbestral and Steroidal Estrogens and Progestins, 53 J.Am.College Obstet & Gynecol 971 (1979). Other abnormalities allegedly caused by in utero exposure to DES are infertility, cervical ectropion, and transverse vaginal and cervical ridges.

6. Plaintiffs in such cases have proceeded on theories which would impose liability on Lilly even though it cannot be established that a Lilly product was ingested. Several jurisdictions have recognized these novel theories of tort liability. See e.g., Sindell v. Abbott Laboratories, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980).

7. For example, current medical research indicates that the clear cell adenocarcinoma allegedly caused by in utero exposure to DES usually develops when the female offspring is between 15 and 25 years of age.

8. Defendants refused to write further insurance to Lilly for DES-related losses on July 15, 1976.

9. In general, those insurers at risk prior to the diagnosis of DES-related diseases took the position that policies in force on the "date of manifestation" of the injury covered DES claims. Similarly, those insurers whose policies were in force on the date of manifestation of DES-related injuries took the position that policies in force on the date of ingestion of DES covered DES claims.

10. In each year Lilly's insurance begins after an initial level of loss or liability for which Lilly is self-insured. This self-insured amount is generally referred to as a self-insured retention or SIR. Above the SIR amount is an initial layer of insurance which insures Lilly against losses in excess of the SIR up to the policies stated limit of liability. In most years, additional layers of insurance insure Lilly against losses in excess of the limits of the initial layer policies. Each layer of insurance covers losses in excess of the amounts covered by the preceding layers up to a maximum liability limit after which another layer is triggered.

11. Prior to 1966, general liability policies provided coverage for liability "because of bodily injury, sickness or disease, including death at anytime resulting therefrom, sustained by any person, caused by accident and arising out of the hazards...." See, American Home Products Corp. v. Liberty Mutual Insurance Co., 565 F.Supp. 1485, 1501 (S.D.N.Y.1983) citing 1 R. Long, Law of Liability Insurance § 11.01 at 11–4 (1979) (emphasis added). Since the word

CGL and Lilly's policies throughout the period relevant to this litigation provide liability coverage for "occurrences" that result in personal injury. The coverage language in 199 of the 254 policies issued to Lilly is representative. It provides that the

> [u]nderwriters hereby agree, subject to the limitations, terms and conditions hereafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay ... for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss," on account of
> (i) personal injuries, including death at any time resulting therefrom, ... cause by or arising out of each occurrence anywhere in the world.

"Personal injuries" is defined as "bodily injury, mental injury, ... sickness, [or] disease", and "occurrence" is defined as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury ... during the policy period." It is clear that each policy, like the CGL, requires that an "injury", and not the "occurrence" which causes the injury, falls within a policy period in order for coverage to trigger. It is, however, unclear under both the CGL language and Lilly's policies when injury occurs. Thus, the ultimate question before this Court is when does "bodily injury, sickness or disease" occur under the liability coverage provision of the policies purchased by Lilly.

## DISCUSSION

### A. *Choice of Law*

The basis for jurisdiction in this case is diversity of citizenship, 28 U.S.C. § 1332(a) (1982 ed.). Thus, it is rudimentary that state law furnishes the substantive rules of decision. *See e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This case, however, has factual contacts with more than one state. Eli Lilly is incorporated in Indiana and maintains its principal place of business in Indianapolis, Indiana. Each of the defendants is either a corporation with citizenship in a state other than Indiana and with its principal place of business outside Indiana, a foreign corporation with its principal place of business outside Indiana, or an individual alien.[12] More importantly, the insurance policies which are the subject of this litigation were negotiated primarily by mail and telephone between plaintiff's employees and its agent Marsh-McClennan and Associates, in Indianapolis, New York, Chicago, Toronto, Montreal, and London and representatives of defendants located largely in the eastern United States and Europe.

When confronted with a multistate case, a court must make a twofold inquiry. First, a court must ascertain whether more than one state has an interest in applying its law to the facts at issue. Second, a court must consider whether the laws of the interested states conflict when applied to the particular dispute. If this question is answered in the affirmative, a court is faced with a classic conflict-of-laws issue and it must then determine what law governs the disposition of the case. Courts will not engage in this choice-of-law exercise, however, when the laws of interested states do not conflict or present what is commonly referred to as a "false con-

---

"accident" suggested an intent to cover liability for injuries sustained by reason of sudden, unexpected, but identifiable events, courts were faced with the question of whether, and to what extent, did the standard policy cover liability for injuries resulting from gradual processes. The insurance industry responded with the CGL which substitutes the "accident" approach with the "occurrence" approach that provides coverage for any injury or damage resulting from both accidents and long-term injurious exposure. The new CGL did not, however, state definitively when injury occurs in cases of insidious diseases. *Id.*

12. Stipulation, filed March 21, 1983, ¶ 2; Stipulation Substituting Certain London Defendants, docketed July 20, 1982, ¶ 1; Answer of Allan Peter Denis Haycock, et al., Docketed July 20, 1982, ¶ 5.

flict."[13] See e.g., Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1041 n. 10 (D.C.Cir.1981) citing Waters v. American Automobile Ins. Co., 363 F.2d 684, 687 (D.C.Cir.1966) and Williams v. Rawlings Truck Line, Inc., 357 F.2d 581, 585 (D.C.Cir.1965).

It is clear that more than one state has an interest in applying its laws governing the interpretation of insurance policies to the coverage provisions of Lilly's policies. For example, Indiana, Pennsylvania, and New York have an obvious interest as the principal states where the parties negotiated and agreed on the terms of the insurance policies. See Affidavit of D.C. Arbogast attached to Plaintiff's Opposition to Defendants' Motion to Dismiss or Transfer; Defendants' Appendix VI, Ex. 828. Further, Indiana has a particular interest in the construction of the coverage provisions since the insured's domicile is Indiana. Thus, the Court must now determine whether the interpretative laws of these states conflict when employed to construe CGL-type coverage terms in cases of insidious diseases, such as DES-related illnesses.

The courts in the interested states which have addressed this issue all begin their analysis by applying the general principles of interpretation of insurance contracts to CGL coverage terms. Although these principles do not differ in any material respect, these courts have derived different constructions of when coverage is triggered in insidious disease claims. Courts in the Second Circuit, applying New York law, and New York courts have largely construed coverage for DES-related claims to trigger when the disease becomes manifest; that is, when the symptoms of the injury become noticeable or diagnosable. See Emons Industries, Inc. v. Liberty Mutual Fire Ins. Co., 567 F.Supp. 335 (S.D.N.Y. 1983); American Home Products Corp. v. Liberty Mutual Insurance Co., 565 F.Supp. 1485, 1493 (S.D.N.Y.1983); quoting American Motorist Insurance Co. v. E.R. Squibb & Sons, Inc., 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct.1978). While federal and state courts in Pennsylvania have not yet construed the coverage of liability for DES-related claims, these courts have determined that coverage for asbestos-related injuries, insidious diseases like DES-related diseases, is triggered at exposure, exposure in residence, and manifestation. See e.g., Crown, Cork & Seal Co., Inc. v. Aetna Casualty & Surety Co., et al., No. 1292 (Pa.D. & C. Aug. 21, 1983) (adopting the theory of "multi-trigger coverage" espoused in Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C.Cir. 1981)).

The U.S. District Court in New York and the state courts of New York have, however, rejected Keene's construction of these CGL-type coverage provisions. In Emons Industries, 567 F.Supp. 335, the Court refused to adopt Keene's multi-trigger construction of when injury occurs under these provisions on the following grounds: 1) New York law may be at variance with Keene since at least one New York state court adopted the manifestation construction of coverage in DES-related lawsuits; 2) the Second Circuit on numerous occasions has applied the manifestation theory to insidious diseases; and 3) New York courts are less likely to "vary the contract of insurance to accomplish its notions of abstract justice...." Id. at 339. It is apparent that New York and Pennsylvania courts give different meanings to the term "injury" as used in a CGL-type coverage clause. Indeed, a court which defines the term "injury" as a noticeable or diagnosable disease in the case of DES-related claims will reach a very different decision than a court which determines that an injury is present from initial exposure to the ultimate manifestation of a DES-related disease.[14] Thus, this conflict between the

---

13. A false conflict is present when either the laws of the interested states are the same or when these laws, though different, produce the same result when applied to the facts at issue.

See generally, Comment, False Conflicts, 55 Calif.L.Rev. 74, 89 (1967).

14. In suits involving asbestos-related diseases, however, a false conflict exists since the differ-

interpretative laws of New York and Pennsylvania in the case of DES-related injuries is neither illusory nor false, and this Court is faced with the classic choice-of-law issue.

▮ To determine what law governs the disposition of a multi-state case, federal courts are obligated to apply the choice of law principles of the forum jurisdiction. *See Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796 (2d Cir.1980); *Perdue v. J.C. Penney Co., Inc.*, 470 F.Supp. 1234 (D.C.N.Y.1979); *Thompson v. Yue*, 426 F.Supp. 853 (D.C.N.J.1977); *Philadelphia Facilities Management Corp. v. Saint Paul Fire & Marine Insurance Co.*, 379 F.Supp. 780 (D.C.Pa.1974). Under the choice-of-law rules of the District of Columbia, the substantive law of the state which has the "more substantial interest" in the resolution of the issues must be applied to the case. *See Lee v. Flintkote Co.*, 593 F.2d 1275, 1279 n. 16 (D.C.Cir.1979); *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1030 n. 22 (D.C.Cir.1973); *Fowler v. A & A Company*, 262 A.2d 344 (D.C. 1970); *Stevens v. American Service Mutual Insurance Co.*, 234 A.2d 305, 309 (D.C. 1967). The "more substantial interest" test is not a mechanical standard and courts must ascertain the quality of the contacts which invoke a state's interest in a particular case. Courts should also give consideration to the relevant policies of all the interested states. *See e.g., Vaston Bandholders Protective Committee v. Green*, 329 U.S. 156, 161–62, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). Moreover, in cases of insurance, a court will look at the following factors to determine which law will apply: 1) the residence of the insured, 2) the place where the application was completed, 3) the places where the policy was negotiated, consummated, and delivered, and 4) the situs of the insured risk. *See Stevens*, 234 A.2d at 309. Applying these principles to this case, it is clear that Indiana has the most significant contacts with the policies at issue and thus, the "more substantial interest" in the interpretation and application of these insurance policies. Eli Lilly, the insured, is an Indiana corporation with its principal place of business in Indiana. Indiana was a principal site of the negotiations and agreement on the terms of the coverage provisions and other pertinent provisions in these policies. More significantly, however, Eli Lilly and at least one of its insurers negotiated and preliminarily agreed that arbitration regarding any dispute over the interpretation of the policies would take place in Indianapolis, Indiana. Accordingly, it is the finding of this Court that Indiana law governs the interpretation of these insurance contracts.

### B. *Summary Judgment*

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment is properly granted where the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, substantiate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Indeed, when ruling on a motion for

---

ent interpretative laws employed by the courts reach the same result, namely coverage for the insured. *See e.g., Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 523 F.Supp. 110 (D.Mass.1981), *modified*, 682 F.2d 12, 17–20 (1st Cir.1982) (manifestation); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1223 (6th Cir.1980) (exposure) *reh'g granted in part and denied in part*, 657 F.2d 814 (6th Cir.1981), *cert denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Keene v. Insurance Co. of North America*, 667 F.2d 1034, 1041 (D.C.Cir.1981) (exposure thru manifestation), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). This "false conflict" is created in asbestos-related claims by the reliance of certain courts on etiological evidence of when asbestos-related injuries become noticeable or diagnosable. Current etiological studies of DES-related diseases indicate, however, that, unlike asbestos-related injuries, DES injuries do not have any identifiable precursors or symptoms. As a result, courts applying the manifestation theory to DES-related diseases have denied the insured coverage from insurers on the risk prior to ultimate manifestation of the DES-related disease as there is no evidence of any cognizable or diagnosable injury until manifestation of the disease. *See e.g., American Motorist Insurance Co. v. E.R. Squibb & Sons, Inc.*, 406 N.Y.S.2d 658, 661 (Sup.Ct.1978).

summary judgment, it is not the Court's function to "[t]ry disputed issues of [material] fact, but only to ascertain whether such an issue is present, and any doubt on that score is to be resolved against the movant." *Abraham v. Graphic Arts Int'l Union,* 660 F.2d 811, 814 n. 24 (D.C.Cir. 1981). A court must also be mindful, however, that a valuable objective of Rule 56 is to avoid useless trials when there are really no triable issues of fact for the factfinder to determine. *See e.g., Merit Motors, Inc. v. Chrysler Corp.,* 417 F.Supp. 263 (D.D.C. 1976), *aff'd,* 569 F.2d 666 (D.C.Cir.1977); *Zweig v. Hearst Corp.,* 521 F.2d 1129 (9th Cir.1975), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975).

Defendants contend that discovery has unveiled a multitude of material facts that are genuinely disputed by the parties. Specifically, defendants argue that a real controversy exists over the authorship of the policy language, Lilly's actual intent to purchase single-trigger coverage for delayed-manifestation claims, and medical evidence as to when DES-related injuries occur. To the contrary, Eli Lilly maintains that these facts are immaterial since the obligations of defendants to indemnify it for DES-related claims are determined by the precepts enunciated by the D.C. Circuit Court of Appeals in *Keene,* 667 F.2d 1034. Alternatively, Lilly asserts that assuming *Keene* does not control the resolution of this case, these facts are still immaterial under the basic principles governing the interpretation of ambiguous language in insurance policies which mandate the result reached in *Keene.*

■ In order for a fact to be deemed material within the meaning of Rule 56 it must be necessary to a court's decision. *See Marshall v. Kimberly-Clark Corp.,* 625 F.2d 1300 (5th Cir.1980); *Beltz Travel Service, Inc. v. International Air Transport Ass'n,* 620 F.2d 1360 (9th Cir.1980); *Cordas v. Specialty Restaurants, Inc.,* 470 F.Supp. 780 (D.Or.1979). While federal law dictates the standards for determining whether summary judgment is appropriate in a diversity case, a federal district court

will look to state law to ascertain what particular facts are material to a state claim. *See e.g., Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211 (5th Cir.1969). As previously stated, Indiana law is the applicable and controlling law in the construction of the coverage provisions at issue in this suit. Thus, Indiana jurisprudence will define what facts are determinative to the construction of CGL-type coverage provisions in cases of insidious diseases, such as DES-related diseases.

■ Neither the Indiana state courts nor federal courts applying Indiana law have determined when "bodily injury" occurs under a CGL-type coverage clause in cases of delayed-manifestation diseases. The absence of any Indiana decisional law on this question does not, however, relieve this Court of its duty to evaluate current Indiana law governing the interpretation of insurance policies and to make an educated prediction of how an Indiana court would interpret the coverage language in Lilly's policies. *See Hiller v. Franklin Mint, Inc.,* 485 F.2d 48 (3d Cir.1973); *American Record Pressing Co. v. U.S. Fidelity & Guaranty,* 466 F.Supp. 1373 (S.D.N.Y. 1979).

It is firmly established in Indiana jurisprudence that an insurance policy is in substance a contract and it is governed by the fundamental principles of interpretation applied to written contracts. *See e.g., Huntington Mutual Ins. Co. v. Walker,* 181 Ind.App. 618, 392 N.E.2d 1182 (1979). Accordingly, when interpreting any provision in an insurance policy the goal of an Indiana court is to ascertain the intent of the parties as disclosed by the language employed in the contract. *See e.g., Shahan v. Brinegar,* 181 Ind.App. 39, 390 N.E.2d 1036 (1979). If the terms of a contract are plain and unambiguous, Indiana courts will enforce the agreement between the parties as it is written. *Id.* However, when the language is ambiguous the courts may either apply the rules of contract construction or look to extrinsic circumstances to give effect to the reasonable expectations

of the parties. *See e.g., American Econo-my Ins. Co. v. Liggett* 426 N.E.2d 136, 141–142 (Ind.Ct.App.1981); *Shahan v. Brinegar,* 181 Ind.App. 39, 390 N.E.2d 1036, 1041 (1979).

Whether an Indiana court will re-sort to the basic principles of contract con-struction or extrinsic evidence to determine the reasonable expectations of the parties depends upon the type and purpose of the contract. For example, in *Shahan v. Brinegar,* 390 N.E.2d 1036, the Indiana Court of Appeals looked to such extrinsic evidence as the facts and circumstances leading up to the execution of the agree-ment where the contract was for the lease of real property and the sale of certain equipment. *Id.* at 1041–1042. To the con-trary, the Indiana Court of Appeals in *United Farm Bureau Mutual Insurance Co. v. Brantley,* 176 Ind.App. 178, 375 N.E.2d 235, 237 (1978) applied the funda-mental principles of construction of insur-ance policies to give effect to the reason-able expectations of the parties to the in-surance contract. *See also, American Economy Ins. Co.,* 426 N.E.2d at 139, 131; *Mutual Hospital Insurance, Co. v. Klap-per,* 288 N.E.2d 279 (Ind.Ct.App.1972) (con-struing ambiguous language in a health insurance policy to give effect to the in-sured's reasonable expectation to receive indemnification and the insurer's expecta-tion to provide indemnification for non-fraudulent claims). Thus, it appears that in cases where the contract is one for insur-ance, Indiana courts will employ the basic principles governing the interpretation of insurance policies to give effect to the par-ties' reasonable expectations rather than conduct a searching inquiry into extrinsic evidence. Under this approach such extrin-sic evidence as the actual intent of the insured is not necessary to the Court's

construction of ambiguous language in an insurance policy.[15] *Cf. American Econo-my Insurance Co.,* 426 N.E.2d at 141–142; *United Farm Bureau Mutual Insurance Co.,* 375 N.E.2d at 237. Accordingly, the Court finds that the extrinsic evidence proffered by defendants is not necessary to the Court's construction of the policies is-sued to Lilly. The remaining task for this Court is to make an educated determination of 1) the construction an Indiana court would give the coverage provisions in Lil-ly's policies; 2) the extent of coverage the court would afford Lilly under the policies and 3) the allocation of liability theory the court would adopt.

*Trigger of Coverage*

Under the interpretative law of Indiana, the terms "bodily injury," "sickness," and "disease" are ambiguous when used in the context of insidious diseases since reason-able persons could honestly give different meanings to these words. *See e.g., Jeffries v. Stewart,* 159 Ind.App. 701, 309 N.E.2d 448, 452 (1974). Since there is no Indiana authority addressing the question of when "bodily injury" occurs in cases of insidious diseases under a CGL–type coverage provi-sion, Indiana courts will "seek succor from other jurisdictions" which have ruled on the issue.[16] *See e.g., Mutual Hospital In-surance Co.,* 288 N.E.2d at 279. The sev-eral courts which have construed these CGL–type coverage clauses in cases of in-sidious diseases have defined injury under either the manifestation, exposure, or mul-ti-trigger theory of liability. *See e.g., American Motorists Insurance Co. v. E.R. Squibb & Sons, Inc.,* 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct.1978); *Insurance Co. of North America v. Forty-Eight Insula-tions, Inc.,* 633 F.2d 1212, 1222 (6th Cir.

15. In *Keene,* the record before the Court of Appeals contained evidence regarding the nego-tiation and drafting of the policies, Keene's al-leged sophistication and economic power, and Keene's actual expectation to receive "single trigger" coverage. Nonetheless, the Court of Appeals viewed this evidence as nondetermina-tive and applied the doctrine of "objective rea-sonable expectations."

16. In attempting to determine the result that an Indiana court would reach, this Court may also refer to such sources as the restatements of law, insurance law treaties, and law review commen-taries. *See American Record Pressing Co. v. U.S. Fidelity & Guaranty Co.,* 466 F.Supp. 1373 (S.D. N.Y.1979).

1980), *reh'g granted in part and denied in part*, 657 F.2d 814 (6th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Keene v. Insurance Co. of North American*, 667 F.2d 1034 (D.C.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

Those courts which have adopted the manifestation theory of when "bodily injury" occurs under the ambiguous CGL terms engage in an exhaustive investigation of extrinsic evidence to derive the intent of the parties. *See e.g., Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance*, 682 F.2d 12 (1st Cir.1982). Courts that construe the occurrence of a "disease" or "bodily injury" under the exposure theory, however, rely heavily on medical evidence on the etiology and progress of the particular insidious disease and the strong policy to broadly construe insurance policies to promote coverage. *See e.g., Insurance Company of North America v. Forty-Eight Insulations*, 633 F.2d 1212. Only those courts that embrace the multi-trigger construction of "bodily injury" truly resort to the basic principles governing the interpretation of ambiguous insurance policies to give effect to the reasonable expectations of the insured and insurer. *See, Crown, Cork & Seal Company, Inc.*, No. 1292 (Pa. Aug. 21, 1983); *Keene*, 667 F.2d 1034.[17] It is most likely then that Indiana courts would adopt the logic of *Keene* given their preference to employ the fundamental rules of construction to effectuate the state's strong policy to construe insurance contracts in a manner that both promotes coverage and favors the legitimate expectations of the parties.

■ Adhering to the principles enunciated in *Keene*, the Court finds that proper construction of the coverage provisions in Lilly's policies is that each insurer on the risk between the initial ingestion of DES

and the manifestation of a DES-related disease is liable to Lilly for indemnification. The coverage terms in Lilly's policies are either identical or functionally identical to the CGL terms in Keene's policies. Furthermore, the policy language does not lead the Court "unambiguously to either the 'exposure' or 'manifestation' interpretation" for such latent diseases as DES-related diseases. *Keene* 667 F.2d at 1043. Most importantly, Lilly could have reasonably expected that it was purchasing coverage for all future liability arising from its product, DES.

*The Extent of Coverage and Allocation of Liability*

■ The policies at issue in this case, as those in *Keene*, provide that the insurance company will indemnify Lilly for all sums that Lilly becomes legally obligated to pay. As a result of this Court's multi-trigger construction of "bodily injury," the issue of whether an insurer is liable in full, or in part, for Lilly's liability must be addressed. It is the holding of the Court that an insurer is liable in full once coverage under its policy is triggered. However, Lilly can only apply one policy's limit to each injury and it may select the policy under which it is to be indemnified. *See Keene* 667 F.2d at 1049–50 *citing Forty-Eight Insulations*, 633 F.2d at 1226 n. 28. In addition, since it is likely that the coverage of more than one insurer will be triggered in any suit against Lilly for a DES-related disease, Lilly's full indemnification from an elected insurer is subject to those provisions in the policies that govern the allocation of liability when more than one policy covers an injury. *See Keene*, 667 F.2d 1050. This limitation does not, however, weaken the "primary duty of the insurers whose coverage is triggered by exposure or manifestation ... to ensure that [Lilly] is indemnified in full." *Id.* An

---

**17.** These generally accepted principles of interpretation of insurance policies are: 1) in construing the scope of coverage under insurance policies, the objective must be to give effect to the policies' dominant purpose of indemnity; 2) ambiguity in an insurance contract should be construed in favor of the insured; and 3) the

court should ordinarily strive to give effect to the objectively reasonable expectations of the insured. *See generally*, Couch on Insurance 2d, §§ 15:14, 15:16, 15:22, 15:41 (2d ed. Anderson 1959); 4 Williston on Contracts, §§ 621, 900 (3d ed. Jaeger 1959).

Order consistent with this Opinion will be entered on this date.